**WOODSON et al. v. HUEY.**

No. 34911.

Supreme Court of Oklahoma.

June 23, 1953.

Rehearing Denied Sept. 22, 1953.

F. C. Swindell and A. D. Mason, Tulsa, for plaintiff in error, Andre B. Carney.

Hudson, Hudson & Wheaton, Tulsa, for plaintiff in error, Fred E. Woodson.

Allen & Allen, Tulsa, Green, Farmer & Woolsey, Tulsa, for defendant in error.

JOHNSON, Justice.

Esther Huey obtained a judgment based on a jury verdict in the amount of $60,000 against Fred E. Woodson and Andre B. Carney in the District Court of Tulsa County; from order overruling the separate motions for new trial of each defendant this appeal is brought.

In support of the allegations of her petition plaintiff's evidence tends to show that she consulted her family doctor, Dr. Ungerman, about a pain in her side; that he diagnosed the condition as a chronic appendix which should be removed and referred her to Dr. Andre B. Carney, a surgeon; that she went to Dr. Carney who confirmed the diagnosis and advised surgery; that she asked Dr. Carney who would give the anesthetic; that he told her he ordinarily recommended Dr. Woodson, which recommendation she agreed to follow; that she asked what kind of anesthetic would be used; that he told her a spinal anesthetic would probably be best; that she stated she was afraid of a spinal block and did not want one; that he told her he had had one himself and considered it very satisfactory but she still contended she did not want a spinal block; that he told her in that case she would not be given a spinal block but would be given a general anesthetic instead; that at the time she first came to Dr. Carney's office she was a healthy woman, 30 years of age,

married, with one child, in good physical condition except for the chronic appendix; that she entered the hospital on the evening of May 20, 1946; that the operation was scheduled for 8:00 a. m. May 21st; that she was given the routine skin tests and certain other preparations necessary prior to an abdominal operation; that she noticed she was not given an enema as was her roommate who was also being prepared for an abdominal operation; that she inquired of the nurse the reason therefor and was told by the nurse that as she was Dr. Carney's patient she would probably be given a spinal anesthetic; that she told the nurse she did not want a spinal block and asked the nurse to call Dr. Carney and tell him; that the nurse said she was too busy to call; that she asked the nurse to call her husband but the nurse said she was too busy to call any one; that plaintiff then called her husband and asked him to call Dr. Carney and ask that she not be given a spinal block; that about twenty minutes later Dr. Ray, Dr. Carney's assistant, came to her room and asked her what was this he heard about her not wanting a spinal block; that he told plaintiff not to worry that she was going to have a general anesthetic and not a spinal block; that the next morning she was given a shot of morphine and was then taken to the operating room; that when she arrived in the operating room she was hazy and groggy; that she was placed on the operating table; that a nurse was standing to her right and Dr. Woodson, whom she had not theretofore met, was standing on her left; that Dr. Carney was not in the operating room during the time she was conscious; that the nurse told her to turn on her right side; that she had never before had any type of operation or been in an operating room; that she knew nothing of the procedure of an operating room or how anesthetics were given; that she obeyed the orders of the nurse and turned on her right side; that the nurse placed one hand beneath her knees and the other at the back of her neck and pulled plaintiff into a bowed position; that the nurse held plaintiff in this position; that she felt a sting in her spine; that there was

no further conversation with the nurse; that she did not talk to Dr. Woodson at all; that after she felt the sting in·her back she felt a grating sensation and pains went down her legs, thighs and feet; that she heard Dr. Woodson say to the nurse, "That must be just in the side"; that immediately after he said this the nurse gave plaintiff a shot in her right arm and she went to sleep; that when she awoke she was back in her hospital room, which was semi-private; that before she became fully and continuously conscious three days later she had had one or two short periods of consciousness; that from the time she became fully conscious she had heavy, cutting pains in her body from the hips down; that she could not move any part of her body from the belt line down; that the pain has never ceased from the date of the operation to the date of trial; that she was in the hospital for 100 days; that she was never able nor did she attempt to walk unassisted after the operation, although on the 5th or 6th day after the operation she attempted to walk assisted by two nurses but could not move her legs or feet at all; that the nurses lost their grip on her and she fell to the floor; that she could not get up; that the nurses called the doctor on the floor who picked her up in his arms and placed her back on the bed; that after that she attempted to walk several times assisted by nurses and crutches; that she left the hospital on August 28, 1946, and returned to her home; that since that date she has been unable to move unassisted by crutches or braces; that Dr. Carney continued to treat her after she left the hospital and braces for her legs were made under his direction; that when the braces are removed her feet drop completely down and she is unable to raise them or control them in any manner; that since the operation she has no control over her bowel movements and has incontinence of the bladder, necessitating the wearing of protection at all times to absorb the leakage from her bladder and bowels; that before the operation she could attend to all her household duties but since the operation she could not.

Dr. Carney, called as a witness by the plaintiff, testified that she told him on her first visit to him that she did not want a spinal block and he told her he would recommend that she not be given one but be given a general anesthetic; that plaintiff chose the date she wished to be operated on and he called the hospital and made the arrangements; that he instructed the hospital to put on her chart that the patient did not want a spinal anesthetic and that this notation was put on her chart; that the hospital prepares a chart showing the results of all routine preliminary tests given a patient which chart goes with the patient to the operating room and which chart stays with the patient at all times; he identified plaintiff's complete clinical record including this chart and a day to day record of her treatment and condition during the 100 days she was in the hospital and this record was introduced in evidence; that when he entered the operating room after scrubbing up plaintiff was asleep; that he discovered she had been given a spinal anesthetic; that he asked Dr. Woodson the reason for this; that Dr. Woodson told him he had read the record, discussed it with the patient, and that she had told him to go ahead and give the spinal block; that the operation itself was successful; that he had nothing to do with changing the anesthetic; that after plaintiff developed other troubles he went ahead and treated her for that.

A medical doctor, who qualified as an expert, called by plaintiff testified that based upon his examination of plaintiff and a study of all her hospital records and history it was his opinion that plaintiff had sustained a puncturing of the spinal cord by something introduced into the cord which had resulted in an active inflammation of the spinal cord producing partial paralysis from the waist down, ankylosis of the hip joints, complete loss of power in the feet, shrinking of the legs, and migraine headaches; that this puncture was made in the fourth lumbar space; that a chronic inflammation had resulted therefrom paralyzing the whole cord below that point; that the cause of the puncture was the introduction of a needle in the giving of the spinal anesthetic; that plaintiff's condition is due to the insertion of the needle into her back resulting in traumatic injury; that such injury is not the usual result of the giving of a spinal anesthetic; that assuming the anesthetic given was a proper one it was the needle that did the harm by tearing the soft tissue, thus allowing leakage of the spinal fluid and resulting inflammation; that plaintiff's condition is permanent.

Evidence as to her medical bills, past and future, was introduced.

At the close of plaintiff's testimony each defendant demurred separately to the evidence of plaintiff; these demurrers were overruled and exceptions saved.

Dr. Woodson testified in his own behalf that he gave practically all of Dr. Carney's anesthetics; that a chart is kept of each patient in the hospital; that he saw plaintiff's chart when she was brought into the operating room; that he examined the chart and found nothing thereon which would indicate to him as an anesthetist that it would be dangerous or improper to give plaintiff a spinal anesthetic nor, on the contrary, was there any emergency which made a spinal block imperative; that plaintiff was lying on the operating table on her side when he came into the operating room; that plaintiff asked him not to give her a spinal anesthetic; that he told her it was a safe anesthetic; that plaintiff finally said "Well, I will not be obstinate, but I want to go to sleep"; that he then fixed his material in preparation to give her a spinal anesthetic; that he infiltrated a place on her back with novocaine while the nurse held plaintiff in a bowed position; that he then introduced the spinal needle into plaintiff's fourth interspace and injected the anesthetic; that he and the nurse then placed plaintiff on her back, laid her right arm out on the table and injected sodium pentothal into her arm; that she immediately went to sleep; that the surgical nurse painted plaintiff's abdomen and did other surgical preparation; that Dr. Carney then came in; that Dr. Carney asked what kind of anesthetic had been given and he told him he had given a spinal block and put her to

sleep with pentothal; that the operation was performed after which he did not see plaintiff again.

Dr. Carney, testifying in his own behalf, stated that plaintiff had a normal convalescence until about six days after the operation when she complained of weakness in both legs; that according to the hospital records plaintiff was able to walk twenty steps under her own power on the sixth day after she got out of bed; that from that point forward she developed definite indications of nerve disturbance down both legs; that the condition became progressively worse; that she became unable within a few days to walk without assistance; that there was an epidemic of polio in the city at the time and he came to the conclusion she had contracted polio; that she was given diathermy and massage; that he had other doctors examine her in consultation with himself; that he treated her for two years after the operation; that in his opinion plaintiff now has the residual effects of poliomyelitis and the anesthetic had nothing to do with her condition.

Several medical experts were called on behalf of defendants the substance of their testimony being that in their opinion plaintiff had polio which caused her paralytic condition and that the spinal block was not a contributing factor thereto.

On rebuttal plaintiff denied that she had ever walked without assistance since the operation; denied that Dr. Carney ever told her she had polio; denied that she was ever treated for polio or that she was ever isolated in a polio ward.

A roommate of plaintiff while she was in the hospital also testified that Dr. Carney told plaintiff she did not have polio and that the tests which he had made showed that she did not have polio. Plaintiff's medical expert testified that her medical records disclosed no symptoms of polio or treatment therefor.

Defendants rested and each separately renewed their demurrers to the evidence and moved for a directed verdict; both demurrers and motions were overruled and exceptions saved.

The trial judge stated that in his opinion there was no evidence which would tend to prove negligence on the part of either doctor and submitted the case to the jury on the theory of technical assault as to both defendants. In his instructions he told the jury that if they found from the evidence that a spinal block had been administered to plaintiff against her wishes and without her assent thereto, express or implied, being given and as a proximate result thereof, plaintiff suffered the damages alleged and proven by her they should bring in a verdict against both defendants. (The instructions given did not tell the jury that Woodson was the agent of Carney.)

The jury returned a verdict in favor of plaintiff against both defendants. At the request of defendants a special interrogatory was submitted to the jury asking whether Dr. Woodson committed an assault upon plaintiff. This interrogatory was answered in the affirmative. Judgment was entered upon the verdict, motions of each defendant for a new trial were overruled, provoking defendants' separate appeals.

Plaintiff's evidence and the reasonable inferences to be drawn therefrom show that she objected to a spinal block, that she made these objections known to Dr. Carney, that he told her she would not be given a spinal block, that she agreed to his choice of Dr. Woodson as an anesthetist, that Dr. Carney put a notation on her hospital chart that she was not to be given a spinal anesthetic, that this chart is prepared for the purpose of advising all doctors coming into contact with a patient of what has been done and what is to be done, that the notation was placed on her chart for Dr. Woodson to read, and that Dr. Woodson, in doing what he should do and in conformance to the universal custom of doctors and hospitals in the use of such charts did read it and knew of her objections, and that she never assented to the giving of a spinal block. This was sufficient evidence to withstand a demurrer to plaintiff's evidence. Dr. Woodson, testifying in his own behalf, admitted that he read the chart.

Dr. Carney's agreement with plaintiff to the effect that she would not be

given a spinal block meant that he would do everything reasonably to be expected of a controlling surgeon to see that she was not given one. He put the instructions on the chart intending that the anesthetist should read and observe them, and the anesthetist did read them. Dr. Carney was not an insurer. Wiley v. Wharton, 68 Ohio App. 345, 41 N.E.2d 255. As a matter of law, under her own evidence, Dr. Carney did everything that could be reasonably expected he would do and was obliged to do. Dr. Woodson, being an expert in the administering of anesthetics, would not be Dr. Carney's agent in the method of administering the anesthetic. Meyer v. St. Paul Mercury Indemnity Co., La.App., 61 So.2d 901. The case was tried solely on a correct theory of assault by reason of the use of a method of anesthetizing objected to by plaintiff. Dr. Carney is not liable.

 As to Dr. Woodson, if he used a method he was told by plaintiff not to use he would be an assaulter. See supporting philosophy in Rolater v. Strain, 39 Okl. 572, 137 P. 96, 50 L.R.A.,N.S., 880; 4 Am.Jur., Assault and Battery, p. 175, § 88. The evidence by plaintiff is, by reasonable inference, that he knew the patient objected to a spinal block. Woodson testified that he read the record and knew of plaintiff's demand that no spinal block be administered and based his defense solely on the ground that she assented to the giving of the spinal anesthetic. A finding that plaintiff never talked to Dr. Woodson and never assented inheres in the jury's verdict. This is the only basis under the instructions upon which the jury could find that Dr. Woodson was a technical assaulter. That finding is binding on us as to the result of the administration of the spinal block. We cannot say under the foregoing facts and circumstances that the proximate relationship, which as we have said inheres in the verdict of the jury, does not exist. The testimony on the point is in direct conflict and the determination of the jury on this question of fact is likewise binding on us.

The instruction of the court heretofore alluded to is tantamount to an instruction to the jury that if Dr. Woodson was liable Dr. Carney was liable and is erroneous; as hereinbefore demonstrated this might have been prejudicial to Dr. Carney, which in view of our holding that he is not liable is immaterial as far as he is concerned. As to Dr. Woodson since it would have the effect of placing his liability contingent upon the liability of Dr. Carney it was not prejudicial but in fact may have been beneficial. At most it was harmless.

The judgment of the court in favor of plaintiff against Dr. Carney is reversed.

There being competent evidence reasonably tending to sustain the judgment against Dr. Woodson and no substantial fundamental error prejudicial to his rights appearing in the record, the judgment as to him is affirmed.

HALLEY, C. J., and WELCH, CORN, ARNOLD and WILLIAMS, JJ., concur.

O'NEAL, J., concurs in reversal as to Carney; dissents in affirmance as to Woodson.