Dorothy THOMPSON and Robert G. Thompson, Appellants,

v.

PRESBYTERIAN HOSPITAL, INC., a domestic corporation; Oklahoma City Anesthesia Associates, Inc.; Billy R. Goetzinger; and James C. Beavers, Appellees.

No. 49608.

Supreme Court of Oklahoma.

July 20, 1982.

As Corrected July 22, 1982.

As Corrected on Denial of Rehearing Nov. 1, 1982.

Howard K. Berry, Jr., Berry & Berry, Oklahoma City, for appellants.

George F. Short, Robert C. Margo, Short, Barnes, Wiggins & Margo, Oklahoma City, for appellees.

OPALA, Justice:

This appeal in a medical malpractice case presents two questions: [1] Was the plaintiff's evidence sufficient to withstand the surgeon's demurrer? and [2] Was there prejudicial error in allowing an additional set of three peremptory jury challenges to multiple defendants whose respective posture, *vis-a-vis* each other, was not shown to be in a state of "serious" conflict? We hold that (a) the surgeon's demurrer was properly sustained, and (b) prejudice to the plaintiff

is to be presumed from allowance of additional peremptory challenges when none of the multiple defendants has met the burden of affirmatively showing the presence of a serious dispute among the co-defendants in the case.

## FACTS

While in the latter stages of labor, Dorothy Thompson [patient] was admitted to Presbyterian Hospital early one morning. She delivered spontaneously and was examined shortly thereafter by her doctor [surgeon]. The patient sustained certain injuries while undergoing tubal ligation the following day.[1] She had been a patient of the surgeon during the period of prenatal care and for some two years before. Aware of her desire to have tubal ligation, the surgeon discussed with her the procedure some five hours after delivery. On receiving her consent, he enlisted the aid of an anesthesiologist. The surgeon informed the latter of his patient's general state of good health despite her obesity and her spontaneous delivery that morning. Because the anesthesiologist was then unable to discuss with the patient her choice of anesthesia, the surgeon acted as a go-between. Later in the day, the surgeon reported (a) that his patient agreed to a spinal anesthesia and (b) that he (the surgeon) would write the pre-operative orders.[2] These included a pre-medication prescription of 100 milligrams of Demerol.[3]

The surgeon next saw the patient just before surgery the following morning. Once the anesthesiologist administered the anesthetic, the surgeon proceeded with the operation. During the tubal ligation proce-

dure the patient suffered an episode of cardiac arrest with resulting massive brain damage, seizures and convulsions.[4] She has died since this appeal was brought. Her administrator has been substituted as a party-litigant.

The patient and her husband [plaintiff] brought a medical malpractice suit against the surgeon, the anesthesiologist, the Oklahoma City Anesthesia Associates, Inc. (a professional corporation) and the hospital. At trial these four defendants were allowed to exercise a total of six peremptory challenges.[5] On demurrers interposed by the surgeon and the hospital to plaintiff's evidence, both of these defendants were let out of the lawsuit. A jury returned a verdict for the remaining two defendants. The plaintiff then unsuccessfully sought leave of court to take depositions in aid of his motion for new trial. This appeal is prosecuted from an adverse ruling on motion for new trial. The hospital stands dismissed, on the plaintiff's own motion, as a party-appellee herein. Judgment in its favor has thus become final.

## I.

## DEFENDANT'S DEMURRER TO THE EVIDENCE WAS PROPERLY SUSTAINED

The plaintiff asserts reversible error in the trial court's ruling that sustained the surgeon's demurrer to the evidence.

Every fact favorable to the party against whom the demurrer is directed, together with all reasonable inferences which may be drawn from them is admitted as true by the demurrer to the evidence.[6] A

---

1. A tubal ligation is a surgical procedure in the course of which fallopian tubes are tied off to prevent future conception. This procedure is usually done within 24 to 48 hours after delivery.

2. Pre-operative orders are instructions to the nursing staff with respect to the patient's preparation for surgery. The orders include a prescription for pre-operative medication.

3. Demerol is an anesthetic given to a patient before administration of a spinal block.

4. The patient's condition was referred to as hypoxic encephalopathy (inadequate blood supply and inadequate oxygen to the nerve cells of the brain and spinal cord.)

5. The terms of 12 O.S.1981 § 575.1(a) provide for only three peremptory challenges for each side of the lawsuit.

6. *Martin v. Stratton,* Okl., 515 P.2d 1366, 1368 [1973]; *Steiger v. Commerce Acceptance of Oklahoma City, Inc.,* Okl., 455 P.2d 81, 86 [1969]; *Ivey v. Henry's Diesel Service, Inc.,*

demurrer may not be sustained unless there is an entire absence of proof to show any right of recovery.[7] Measuring the proof by the applicable standard, we conclude that the judgment of the trial court must be sustained.

█ Three elements essential to a prima facie case of negligence are: (a) a duty owed by the defendant to protect the plaintiff from injury, (b) a failure to properly exercise or perform that duty and (c) plaintiff's injuries proximately caused by the defendant's failure to exercise his duty of care.[8]

In support of his contention that the surgeon's demurrer to the evidence was improperly sustained, the plaintiff urges a threefold analysis of proof—via direct evidence of negligence, circumstantial evidence and *res ipsa loquitur.*

Our outline of the record is not intended here as an ascription or attribution of weight or value to any part of the evidence that tends to indicate negligence on the part of the anesthesiologist. Its purpose is merely to demonstrate the presence of proof warranting submission of issues to the jury.

## 1. *Direct Evidence of Negligence*

█ The negligent act for which liability was sought to be imposed is the surgeon's deviation from acceptable medical practice by his invasion of the anesthesiologist's province in prescribing pre-medication (Demerol) for the spinal block.

There was testimony by the plaintiff's medical expert, Dr. G, that the surgeon's very *act of prescribing Demerol* was a deviation which, when combined with the later actions of the anesthesiologist, started a chain of events that led to the patient's hypoxic brain damage. The record is devoid of any proof that the pre-surgery *use of Demerol* as pre-medication antecedent to spinal anesthesia, for a person in a condition like that of the patient, was in fact below standard medical practice. Dr. M, another of the plaintiff's medical experts, testified that it would not be. Dr. G did no more than state that he would not have selected Demerol as the pre-operative medication in this case. No expert testified that Demerol itself was the cause of the patient's injuries.

█ Negligence is not actionable unless it proximately causes the harm for which liability is sought to be imposed. Failure to establish that defendant's negligence was the proximate cause of the harmful event is fatal to the plaintiff's claim.[9] Proximate cause is a juridical question, not one of expert medical knowledge.[10] It involves many factors not within the expertise of a physician. Some of these are legal and some factual. As a general rule, the question of proximate cause in a negligent tort case is one of fact for the jury.[11] It becomes one of law when there is no evidence from which the jury could reasonably find a causal nexus between the negligent act and the resulting injuries. The sufficiency of the evidence to show causal connection between the acts of the defendant and the injury complained of presents a question of law for the court.[12] The gener-

Okl., 418 P.2d 634, 638 [1966]; *Condo v. Beal,* Okl., 424 P.2d 48, 51 [1967]; *Haynie v. Haynie,* Okl., 426 P.2d 717, 720–721 [1967]; *Orthopedic Clinic v. Hanson,* Okl., 415 P.2d 991, 995 [1966]; *Sisler v. Whitten,* Okl., 393 P.2d 497, 503 [1964].

7. *Fletcher v. Meadow Gold Co.,* Okl., 472 P.2d 885, 888 [1970]; *Martin v. Stratton, supra note 6; Condo v. Beal, supra note 6; Haynie v. Haynie, supra note 6.*

8. *Nicholson v. Tacker,* Okl., 512 P.2d 156, 158 [1973]; *Rush v. Mullins,* Okl., 370 P.2d 557, 559 [1962]; *St. Louis-San Francisco Railway Co. v. Witty,* Okl., 327 P.2d 453, 455 [1958].

9. *Billy v. Texas, O. & E. R. Co.,* Okl., 263 P.2d 187, 190 [1953].

10. *Thompson v. White,* 274 Ala. 413, 149 So.2d 797, 803 [1963]; *Underwood v. Smith,* 261 Ala. 181, 73 So.2d 717, 725 [1954].

11. *Smith v. Davis,* Okl., 430 P.2d 799, 800 [1967].

12. *Pepsi-Cola Bottling Co. of Tulsa v. Von Brady,* Okl., 386 P.2d 993, 996 [1964].

al rule is that the causal connection between an act of negligence and an injury is broken by the intervention of a new, independent and efficient cause which was neither anticipated nor reasonably foreseeable.[13]

It would be indeed an invasion of the province of the court to allow Dr. G's opinion to pre-empt the proximate cause question simply because he believed there was a causal link between the surgeon's *act of prescribing Demerol* and the injury sustained. It is the court's duty to determine as a matter of law whether the evidence is sufficient to show a causal connection or whether the intervening factors adduced by the proof did break the causal nexus between the surgeon's actions and the resulting injury. Dr. G's opinion cannot dispense with the plaintiff's legal duty to establish not only that the Demerol prescription was, under the circumstances, a breach of accepted medical standards, *but also that the patient's injurious episode of hypoxia encephalopathy* was reasonably foreseeable from the surgeon's act of prescribing the Demerol.

The record is barren of proof to the effect that the surgeon could reasonably anticipate the synergistic effect of Demerol in combination with the saddle block would repress the patient's breathing. All expert medical testimony indicated that, under the circumstances adduced, the *use of Demerol* in connection with a saddle block was not below acceptable medical standards. Reasonable minds cannot differ as to the tenor of the expert evidence. The surgeon simply could foresee neither that the anesthesiologist would give an improper saddle block nor that he would then fail properly to monitor the patient during surgery. Foreseeability is ordinarily a question of fact. It becomes a question of law when, as here, proof to the contrary is absent and but one

reasonable inference may be drawn from the adduced facts.[14] The undisputed facts leave no room for a reasonable difference of opinion and we hold, as a matter of law, that the surgeon could not have reasonably anticipated either the occurrence of the anesthesiologist's breach of duty nor the ultimate harm to the patient.

The intervening factor which will break the causal nexus between the defendant's negligence and the resulting injury is called in law the "supervening" cause. A true supervening cause that will operate effectively to insulate the original actor from liability must meet a three-prong test. It must be (1) independent of the original act, (2) adequate of itself to bring about the result and (3) one whose occurrence was not reasonably foreseeable.[15] Unless these characteristics are met, the chain of causation which extends from the original act to the injury is not broken. Whenever the causal factor under examination qualifies as one of supervening quality, the original negligence may be said to undergo a legal metamorphosis into a remote cause or "mere condition".[16]

Not every intervening cause will insulate the original negligent actor from liability. If a causal factor is capable of combining or acting in concert with another act or omission to produce the injury, each negligent actor will be subject to liability for the harm that evolves. The same is said to be true when several causes operate to bring about a single result.[17]

From the undisputed facts in the record we cannot conclude that the *act of prescribing Demerol* can be viewed in law as the proximate cause of the patient's injuries. Nor can we view it as a concurring

13. *Pepsi-Cola Bottling Co. of Tulsa v. Von Brady,* supra note 12.

14. *Cole v. Dirkson,* 202 Kan. 431, 449 P.2d 584, 586 [1969]; *Parker v. City and County of San Francisco,* 158 Cal.App.2d 597, 323 P.2d 108, 114 [1958].

15. *Long v. Ponca City Hospital, Inc.,* Okl., 593 P.2d 1081, 1087 [1979]; *Minor v. Zidell Trust,* Okl., 618 P.2d 392, 394 [1980].

16. *Minor v. Zidell Trust,* supra note 15 at 394.

17. *Minor v. Zidell Trust,* supra note 15.

cause within the meaning of the law. Dr. G testified that the patient's hypoxia [lack of oxygen] resulted from insufficient breathing while she was under a spinal anesthesia and narcotized with Demerol. The insufficient uptake of oxygen was viewed as having been occasioned by a failure to monitor the patient while under the anesthesia. Dr. P, another medical expert for the plaintiff, noted on the patient's hospital chart that the cause of the respiratory failure was "block and Demerol, most likely". This was based on Dr. P's initial assessment that the spinal block extended too high and that it paralyzed the patient's ability to breathe which was then depressed by the superimposition of the Demerol. The *act of prescribing the Demerol,* offered as negligent for the sole reason that it was the surgeon who ordered the pre-medication rather than the anesthesiologist, was clearly supervened by the later acts of deficient care by the anesthesiologist. The injuries clearly could not have happened except for the unforeseeable and hence supervening negligence of the anesthesiologist.

## 2. Circumstantial Evidence of Negligence

█ The facts relied upon by the plaintiff in asserting there was circumstantial evidence of negligence are the hospital records and charts indicating that no medical history or physical examination, hemoglobin test or urinalysis had been conducted before the patient's surgery. All these tests are required by hospital rules. Although these derelictions relate directly to duties of the anesthesiologist, plaintiff contends that by a reasonable inference the failure can also be attributed to the surgeon. It is urged that the surgeon has a duty to exercise a minimum amount of control over the anesthesiologist to insure that the latter functions in a proper manner within accepted

medical standards. The absence of an EKG monitor during surgery is also urged as a significant deviation from accepted medical practice and a breach of a duty owed by the anesthesiologist. Again, plaintiff contends that while the surgeon was not primarily responsible for the actions of the anesthesiologist, he is accountable for maintaining a threshold level of care to the patient.

The law is well settled that the operating surgeon is not an insurer against the negligent acts of the anesthesiologist.[18] In administering anesthetics the latter functions as an independent professional who is not subject to the surgeon's control. Agency cannot avail here for imputing to the surgeon the anesthesiologist's allegedly negligent conduct.

## 3. Res Ipsa Loquitur

The plaintiff next contends that the surgeon's demurrer should have been overruled because there was sufficient evidence to infer negligence from the surgeon's control of the instrumentality causing the injuries. This argument is based on *res ipsa loquitur.*

█ This doctrine is generally applied to an injury that does not occur in the usual course of everyday conduct unless a person who controls the instrumentality likely to produce injury fails to exercise due care to prevent its occurrence.[19] With the aid of *res ipsa loquitur* negligence may be inferred from the harm without the aid of circumstances pointing to the responsible human cause. The fundamental element is the "control of the instrumentality" which caused the damage.[20] Medical malpractice cases may not escape the application of this doctrine when the circumstances attendant upon the harm are themselves of such a character as to justify a jury's inference of negligence as the cause of that harm.[21]

18. *Woodson v. Huey,* Okl., 261 P.2d 199, 204 [1953].

19. *Briscoe v. Oklahoma Natural Gas Co.,* Okl., 509 P.2d 126, 128 [1973].

20. *St. John's Hospital and School of Nursing v. Chapman,* Okl., 434 P.2d 160, 166 [1967].

21. *St. John's Hospital and School of Nursing v. Chapman,* supra note 20.

The application of *res ipsa loquitur* presents a question of law since it is a judicial function to determine whether a certain set of circumstances does, as a matter of law, permit a given inference.[22]

The evidence here, traced from the point in time when injuries were sustained back to the beginning of the chain of events, indicates—*via* the expert medical testimony adduced—injury to the brain was caused by the patient's failure to receive sufficient oxygen. Repressed breathing of a patient during surgery can be caused by a spinal block that extends too high, particularly when combined with Demerol as the pre-medication anesthetic. Proper monitoring of the patient's vital signs by the anesthesiologist would facilitate early detection of the onset of breathing difficulties. Even when used in combination with a spinal block anesthetic, Demerol is not viewed by the professional community as a deviation from accepted medical standards. No causal negligence under the doctrine of *res ipsa loquitur* can hence be inferred from the surgeon's *act of prescribing Demerol.*

Injuries caused by a failure properly to monitor a patient to see that adequate supply of oxygen is received during surgery cannot be said to have been caused by an instrumentality that was under the control and management of the surgeon. We hence conclude that the doctrine of *res ipsa loquitur* is not applicable here and that the surgeon's demurrer was properly sustained.

## II.

### THE ALLOWANCE OF ADDITIONAL PEREMPTORY CHALLENGES WITHOUT PROOF OF A SERIOUS DISPUTE AMONG MULTIPLE DEFENDANTS IS REVERSIBLE ERROR

The plaintiff next urges reversible error in allowing six peremptory challenges to the defense—three to the hospital and three to the remaining defendants collectively. The ruling is assailed for procedural infirmity because it was made without a written request and the requisite hearing at which a serious conflict of interest among the four defendants, or some of them, was shown.

■ The day before trial the court informed the parties of its view that a request for supernumerary challenges might be in order. At the opening of trial the hospital's verbal request for three additional challenges was granted. The decision on whether supernumerary challenges are to be allowed must be made on motion of a defendant. 12 O.S.1981 § 575.1.[23] A written motion does not appear to be indispensable. We hence find no error in its absence.

■ The statute extends three peremptory challenges to each "side of the lawsuit".[24] Upon showing a "serious dispute" among multiple defendants more challenges may be allowed.[25] The record in this case does not disclose the presence of any conflict among the defendants. The likelihood of its evolution during the trial was suggested by the defendant-hospital as a mere

22. *Turney v. Anspaugh,* Okl., 581 P.2d 1301, 1304 [1978].

23. The terms of 12 O.S.1981 § 575.1 provide: "* * * If there be more than one defendant in the case, and the trial judge determines *on motion* that there is a *serious conflict of interest* between them, he may, in his discretion, allow each defendant to strike three names from the list of jurors seated and passed for cause. * * *" [Emphasis added].

24. The three additional peremptory challenges of which the plaintiff complains were granted

to the hospital—the entity later dismissed as a party-defendant.

25. Before the 1969 enactment of § 575.1, supra note 23, allowing additional peremptory challenges to multiple defendants, we held in *M. & D. Motor Freight Lines v. Kelley,* 201 Okl. 121, 202 P.2d 215 [1949] that whenever there is an antagonistic posture among co-defendants an additional number of peremptory challenges would be warranted. *Kelley* constituted the common law of the state. The enactment of § 575.1 gave recognition to its teaching.

possibility but *no* showing of any sort was tendered to support the statement.

The plaintiff contends that the granting of an additional set of peremptory challenges to the defendants, without affirmative proof of a "serious dispute", is prejudicial as a matter of law. The defendants counter that absent actual prejudice there can be no reversible error. The prejudicial effect that may be ascribed to the court's improper allowance of additional challenges is a matter of first impression in Oklahoma. Extant case law discloses a division among other jurisdictions.[26]

Opportunity to challenge jurors peremptorily invests a party with power to excuse the veniremen without cause.[27] It is a potent tool for excluding those deemed the least likely to be either hostile or neutral. The greater the number of challenges, the greater the party's chances for organizing the jury for a favorable verdict.[28] A jury panel that emerges from a selection process tainted by an exercise of excessive challenges cannot be said to possess the constitutionally-mandated attributes of neutrality and detachment. We regard an absence of a balanced selection process as a cognizable form of prejudice.

The right to trial by a fair and impartial jury is protected by the due process clause of the federal constitution[29] and by the due process and other provisions of our state

---

**26.** In those jurisdictions supporting plaintiff's view, the following principles evolve: (1) The exercise of peremptory challenge is a substantial right which may be prejudicially lessened in value by an erroneous increase or decrease in the number of peremptory challenges available to a party. Such excessive peremptory challenges disturb the balance of interests and is prejudicial as a matter of law. *Penaskovic v. F.W. Woolworth Co.,* 20 Ariz.App. 403, 513 P.2d 692, 694 [1973]; *Nieves v. Kietlinski,* 22 Ohio St.2d 139, 258 N.E.2d 454 [1970]. (2) Excessive peremptory challenges give a party an additional power of choice among qualified jurors, thus making his right to exercise peremptory challenges relatively more valuable and the other party's right less valuable. *Searle v. Roman Catholic Bishop of Springfield,* 203 Mass. 493, 89 N.E. 809, 811–812 [1909]. (3) An incident of a party's right to a fair and impartial jury is one that is lawfully constituted. The exercise of peremptory challenges is an aid in securing an impartial jury. The statutory conditions and terms setting up an authorized jury are not met when the right of peremptory challenge is impaired. *Moran v. Jones,* 75 Ariz. 175, 253 P.2d 891, 894 [1953]. The rationale of those jurisdictions supporting the defendants' position is: (1) A jury panel, after all challenges for cause have been made, consists of qualified jurors. One who is improperly rejected by an excessive peremptory challenge will be replaced by another equally qualified and unexceptional juror—the law presuming that every juror sworn in the case is indifferent and above legal exception. Since the law is more concerned with the fairness of the trial and the impartiality of the jurors than with the particular persons who compose the jury and render the verdict, the decisive test is the fact of a fair trial and is challenged only upon a showing that prejudice occurred. *Stevens v. Union R. Co.,* 26 R.I. 90, 58 A. 492

[1904]. (2) An adverse verdict without more does not demonstrate that the offended party was deprived of a fair trial, thus judgment should not be reversed and litigation prolonged unless error appears which may reasonably affect the result to the prejudice of the offended party. *Fick v. Wolfinger,* 293 Minn. 483, 198 N.W.2d 146 [1972]; *Wilson v. Ceretti,* 210 N.W.2d 643 [Ia.1973]; *Leary v. Kelly Pipe Company,* 169 Mont. 511, 549 P.2d 813, 816 [1976]. In *Leary* the court struck down an earlier opinion, *Ferron v. Intermountain Transp. Co.,* 115 Mont. 388, 143 P.2d 893 [1943] to the extent that a party must now show that any error in allowing additional challenges was prejudicial to him.

**27.** *Brown v. Marker,* Okl., 410 P.2d 61, 65 [1966].

**28.** The thesis that there is potential for forming a "friendlier" panel through the use of excessive peremptory challenges cannot be lightly rejected. Peremptory Challenge—Divining Rod for a Sympathetic Jury?, 21 Catholic Lawyer 56 [Winter 1975]; Shapley, Jury Selection: Social Scientists Gamble in an Already Loaded Game, 185 Science 1033 [1974]; Younger, Unlawful Peremptory Challenges, 21 Judges' Journal 27 [Winter 1982].

In *United States v. Randall,* 27 F.Cas. 696 (No. 16,118) [D.Ore.1869], the court condemned the criminal defendant's quest for excessive peremptory challenges with the following observation: "In modern times, in most of the United States, the practice of law has gone to the other extreme, so that the number of peremptory challenges allowed a defendant enables him, in many cases, to form a jury that is morally certain to acquit or at least disagree."

**29.** 14th Amend., U.S. Const.

constitution.[30] Due process in this context means an unbiased jury capable and willing to decide the case solely on the evidence. A jury selection process that is free from devices injurious to neutrality and detachment of the fact trier is critical to the integrity of the fact finding process. It represents a right no less valued when property is in contention than when life or liberty be at stake. The value is so important that from its very denial prejudice must be presumed.[31]

The parameters of judicial discretion in considering requests for additional peremptory challenges are of a constitutional dimension. We adopt here a practice which confines the allowance of additional challenges within the bounds of the statute and of the fundamental law's protection of the right to an impartial jury.

■ Prejudice to the plaintiff will be deemed to have occurred when any additional peremptory challenge is allowed to a defendant who fails to show the factum of a "serious dispute" with one or more co-defendants in the case. The decision to grant additional challenges cannot be viewed as a matter of unregulated judicial discretion. Unless the record supports the presence of a serious dispute, prejudice will be presumed and the judgment will be reversed for unwarranted allowance of supernumerary challenges.

■ What remains to be determined is whether the constitutional safeguard announced here should have prospective or retrospective application. Retroactivity is the traditional common law approach to implementation of decisions overruling prior case law. Whether and to what extent a new rule will be given retroactive effect is not a matter of constitutional compulsion but rather one of judicial policy.[32]

■ In *Linkletter v. Walker*,[33] the Court established a tripartite test for determining whether a new constitutional rule should be applied retroactively. It said that the court must look to (a) the purpose of the new rule, (b) the extent of reliance placed upon the old doctrine and (c) the burden placed on the administration of legal process by the increased volume of retrials.

Foremost among the elements of the test is the *purpose* to be served by the new constitutional rule. If the purpose is not advanced by making the rule retroactive, then it may be applied prospectively or with limited retrospective effect.[34] A purpose demanding retroactivity is one which goes to the fairness of the trial—the very integrity of the fact finding process. If other safeguards may be employed to protect the integrity of the truth determining process, then retroactivity is not required.[35] When the integrity of the fact finding process is

30. This fundamental right was found to be violated when an alternate juror was permitted to participate in a jury's deliberations. *Brigman v. State,* Okl.Cr., 350 P.2d 321 [1960]. In another case where the jury selection process was being challenged, we concluded that all the parties may demand a fair and impartial jury (a) composed of jurors possessing the requisite statutory qualifications, (b) selected and impaneled in the mode prescribed by law and (c) without illegal discrimination of any character. *Agee v. Gant,* Okl., 412 P.2d 155, 161–162 [1966].

31. *Glasser v. U.S.,* 315 U.S. 60, 83–87, 62 S.Ct. 457, 470–472, 86 L.Ed. 680 [1942].

32. *Great Northern Ry. Co. v. Sunburst Oil and Refining Co.,* 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360, 366 [1932].

33. 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 [1965].

34. *Linkletter v. Walker,* supra note 31, held that the rule enunciated in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 [1961], which excludes illegally seized evidence from state criminal trials, would not be applied retroactively to convictions that had become final before the date of the *Mapp* decision. *The purpose of the rule* adopted in *Mapp* was to enforce the fourth amendment by creating an effective deterrent to unlawful police action. Since the misconduct already had occurred and would not be corrected by releasing prisoners whose convictions were based upon illegally seized evidence, *this purpose would not be served by applying the rule to convictions which already had become final.*

35. *Johnson v. New Jersey,* 384 U.S. 719, 729, 86 S.Ct. 1772, 1779, 16 L.Ed.2d 882, 890 [1966].

involved, it matters not that the case arises in a civil or criminal context. We hence adopt *Linkletter*—a criminal case—as our analytical touchstone in the instant case.[36]

The second and third factors—*reliance* and *burden on the administration of legal process* that would flow from a retroactive application—are closely related since the consequences of prior reliance may burden the administration of legal process by an increased volume of retrials. They have no application if the *purpose factor* mandates a retrospective application of the new constitutional standard. These two aspects of the test—usually relied upon as support for the argument against pure retroactivity—are not crucial here. The announced rule does not make a sharp break with the past by overruling established precedent nor does it upset a long standing practice that has been extensively relied on. It merely establishes a new rule—founded on constitutional principles—which declares that allowance of excessive peremptory challenges shall be grounds for a new trial.

The clear purpose of the rule is to safeguard the constitutional guarantee of trial by an impartial jury. The restrictions imposed are designed to prevent a jury from being organized by a group of defendants for a favorable result. There are no alternative safeguards to protect the integrity of the fact finding process. Since the purpose of this rule may be advanced by retroactive application, we hold that it shall be given retrospective effect in the instant case.

Affirmed in part and reversed in part; cause remanded.

IRWIN, C.J., BARNES, V.C.J., and HODGES, LAVENDER and HARGRAVE, JJ., concur in Part I.

HODGES, SIMMS, DOOLIN and WILSON, JJ., concur in Part II.

SIMMS, DOOLIN and WILSON, JJ., dissent from Part I.

IRWIN, C.J., BARNES, V.C.J., and LAVENDER and HARGRAVE, JJ., dissent from Part II.

SIMMS, Justice, concurring in part; dissenting in part:

I concur in Part II of the majority opinion for in my view this issue was long ago settled in *M & D Motor Freight Lines v. Kelly,* 201 Okl. 121, 202 P. 215 (1949), cited in Footnote 25 by the majority.

However, I respectfully dissent from Part I of the Court's views expressed today for the reasons expressed in the dissent of Justice Wilson; and I must recede from the majority's treatment of *res ipsa loquitur* because of views articulated in my dissenting opinion in *Martin v. Stratton,* Okl., 515 P.2d 1366, 1372 (1973).

WILSON, J., concurring in part; dissenting in part:

I concur with the majority opinion on most points of this appeal. I dissent from the Court's decision to affirm the trial court's sustention of the surgeon's demurrer to the plaintiffs' evidence. I have no quarrel with my learned colleague's articulation of the general rules governing this point. I depart from the majority when it comes to applying these rules and reaching a conclusion on the record before us today.

The issue is whether, taking the evidence and inferences from it in the light most favorable to the plaintiffs, reasonable

36. In a somewhat modified form, *Linkletter,* supra note 32, was applied to a civil case pronouncement in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–107, 92 S.Ct. 349, 355, 30 L.Ed.2d 296, 306 [1971]. The criteria articulated in *Chevron* are: (1) the novelty of the rule, (2) the purpose and effect of the rule and whether it would be furthered or retarded by its retroactive application and (3) possible inequities produced by retroactivity. While not quite an exact duplication of the "purpose, reliance and effect" criteria of *Linkletter* and its progeny, the *Chevron*-applied factors appear entirely consistent with our conclusion which rules out for this case *any* restriction upon its fully retroactive sweep. In a more recent civil case, *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the U.S. Supreme Court reaffirmed the *Chevron* criteria as bearing on the issue of retroactivity.

minds could differ in deciding whether the plaintiffs established actionable negligence on the part of the surgeon. Viewing the evidence through this lens, I am convinced that reasonable minds could indeed have differed, first, on whether the surgeon fell below the standard of care, and then, on whether the surgeon's actions were a proximate cause of the injury.

Regarding the first two elements of the plaintiffs' cause against the surgeon—a standard of due care and breach of that standard—the majority says there was no evidence of either. I disagree. Dr. G, called as an expert medical witness, specifically testified that the choice of Demerol as a pre-operative medication "is not indicated" for a patient in Dorothy Thompson's situation, and that he would have chosen other drugs for the purpose. He also expressed his opinion that "deviation from accepted medical practice" was a cause or factor contributing to the injury.

Granted, this evidence was slight. Nevertheless, even the slightest evidence is enough to withstand a demurrer and require sending the case to the jury, just so long as reasonable minds could reach differing conclusions from that evidence. *Hillcrest Medical Center v. Wier*, 373 P.2d 45 (Okl.1962). In my view, Dr. G's expert testimony alone was enough to justify submitting to the jury, under appropriate instruction, whether or not the surgeon's conduct fell below the applicable standard of care.

The third element of the action, causation, raises more complicated questions. Discussing the proximate cause issue, the majority opinion analyzes the law of intervening and superseding causes, sometimes couched in terms of condition-versus-cause. The majority states that foreseeability is the key to the causation issue. It then goes on to hold, as a matter of law, that the surgeon could not have reasonably foreseen the anesthesiologist's actions or the harm to the patient.

I do not think the causation issue could be decided in this case, one way or the other, as a matter of law. Again, I believe that the plaintiffs' evidence, including Dr. G's .

testimony, required submitting the question to the jury.

Dr. G explained that the surgeon's choice of Demerol, a narcotic which depresses breathing, started "the chain of events," that it was an "essential factor," a "contributing factor," which bore "a direct causal connection" to patient Dorothy Thompson's brain damage from lack of oxygen.

My brethren of the majority discount this testimony entirely, stressing that proximate causation is a legal question, not a medical one, and warning against allowing an expert opinion to "preempt" the proximate cause question. Any expert medical testimony which establishes that surgeon-defendant's conduct was a "deviation from accepted medical practice" together with testimony linking this "deviation" to the injury complained of requires the trial court to submit this evidence to the jury under appropriate instructions.

Just as an expert opinion should not usurp the Court's role, neither should a judge usurp the jury's role. On the contrary, as held in *Pepsi-Cola Bottling Co. of Tulsa, Oklahoma v. Von Brady*, 386 P.2d 993 (Okl.1963), if there is *any* evidence tending to show a causal connection between the defendant's conduct and the injury, the question goes to the jury. This "any evidence" standard was met in the case at bar.

Further support for submitting this cause to the jury comes from *Long v. Ponca City Hospital, Inc.*, 593 P.2d 1081 (1979). There, the hospital staff negligently inserted a catheter in the patient's rectum before surgery. During surgery, the doctor yanked the catheter out, thus contaminating the surgical field. The proximate cause issue was whether the surgeon's action was unforeseeable, and hence whether it superseded the hospital staff's action. This Court held the question could not be answered as a matter of law. Rather, it called for a determination by the jury.

I would hold likewise in the case at bar. I believe it was improper to sustain the surgeon's demurrer to the plaintiff's evidence because I am convinced that, viewing

the evidence in a light favorable to the plaintiffs, reasonable minds could have reached different conclusions in deciding whether the surgeon was negligent and whether his negligence, if any, was actionable.