Tim JACKSON, Plaintiff–Appellant,

v.

MERCY HEALTH CENTER, INC., Defendant–Appellee.

No. 75759.

Supreme Court of Oklahoma.

Nov. 30, 1993.

Rex K. Travis, Oklahoma City, for appellant.

Charles F. Alden III, Elizabeth J. Dunning, Holloway, Dobson, Hudson & Bachman, Oklahoma City, for appellee.

OPALA, Justice.

The single issue on certiorari is whether the Good Samaritan [1] Act, 76 O.S.1991 § 5,[2] gives defendant Mercy Health Center, Inc. [the Hospital] statutory immunity from liability for its personnel's allegedly negligent attempt to render medical aid to plaintiff Tim Jackson, a hospital visitor. We answer in the affirmative.

## I.

### THE ANATOMY OF LITIGATION

At the Hospital's invitation Tim Jackson [the visitor] accompanied his pregnant wife to the operating room to comfort her and to observe his baby's delivery by Caesarean section.[3] The visitor became dizzy while watching preparations for the surgical procedure. Hospital personnel came to his rescue by taking his arm and seating him upon his wife's hospital bed which had been left in the hallway outside the surgery room. After being seated but not secured he fell and injured himself. The visitor sued the Hospital for negligence, alleging that its personnel should have taken precautions to prevent his harm-dealing fall. The trial judge sustained the Hospital's demurrer, holding the defendant to be statutorily immune from liability for any negligence which might have resulted in the injurious fall. The Court of Appeals reversed and remanded the case for trial; it reasoned that statutory immunity cannot shield the Hospital from liability because its visitor was not in *danger of death or serious bodily harm* when hospital personnel came to his aid. We granted certiorari on Hospital's petition.

## II.

### THE TRIAL COURT DID NOT ERR IN GIVING JUDGMENT TO THE HOSPITAL ON SUSTAINING ITS DEMURRER TO THE EVIDENCE

The Hospital urges the Court of Appeals should have affirmed the trial court's deci-

---

1. According to the dictionary, a "Good Samaritan" is "one who compassionately renders personal assistance to the unfortunate." *See* Webster's Third New International Dictionary, 979 (1965). The origin of the phrase is a New Testament parable in which a Samaritan was the only passer-by to aid a man who had been beaten and robbed. Good Samaritan laws afford immunity from civil liability to one who volunteers services to an imperiled person whom the helper has no legal duty to assist.

2. The pertinent terms of 76 O.S.1991 § 5 are:

 (a) Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself, and *except as hereinafter provided:*
 (1) Where *no* prior contractual relationship exists, any person licensed to practice any method of treatment of human ailments, disease, pain, injury, deformity, mental or physical condition, or licensed to render services ancillary thereto, including licensed registered and practical nurses, who, *under emergency circumstances that suggest the giving of aid is the only alternative to probable death or serious bodily injury, in good faith, voluntarily and without compensation, renders or attempts to render emergency care to an injured person or any person who is in need of immediate medical aid,* wherever required, *shall not be liable for damages as a result of any acts or omissions* except for committing gross negligence or willful or wanton wrongs in rendering the emergency care. [Emphasis supplied.]

3. Caesarean section means a surgical incision through a pregnant woman's abdominal wall and uterus to remove a fetus. The term originates from the belief that this operation was used to deliver Julius Caesar. Webster's, *supra* note 1 at 367.

sion that the Good Samaritan Act provides it with a shield from liability for negligence.[4] According to the visitor, the Court of Appeals' decision that the Hospital is *not* statutorily immune should be affirmed because he (a) had *contracted* to pay for the Hospital's services which were to be extended to *his wife and baby* and (b) was *never in danger of death or serious bodily harm.*

 A demurrer to the evidence admits as true *every fact* favorable to the party against whom the demurrer is directed, together with all reasonable inferences which may be drawn from them.[5] Absent an entire want of proof to show any right of recovery, it is error to sustain the demurrer.[6] *For our review we assume that the Hospital may have been negligent in failing to securely seat the visitor when he became dizzy.* Measuring the visitor's

proof by the applicable legal norms, we conclude that *statutory immunity is a complete defense to his claim for negligence in rendering emergency medical aid.*

### III.

### THE GOOD SAMARITAN ACT ABROGATES THE COMMON–LAW RESCUE DOCTRINE FOR MEDICAL PROVIDERS

 At common law no duty is imposed to rescue a person who is in peril, absent some relationship between the parties that creates a special responsibility[7] not owed to the general public.[8] If one voluntarily *undertakes to rescue a stranger,* the rescuer is liable for physical harm that results from failure to exercise reasonable care.[9]

---

**4.** Alternatively, the Hospital urges that premises liability standards entitle it to judgment as a matter of law. *It is only where a visitor—invitee, licensee, or trespasser—claims bodily harm from some unsafe condition upon the locus in quo that premises liability is implicated. See Sutherland v. St. Francis Hospital, Inc.,* Okl., 595 P.2d 780 (1979). *See also* ANNOTATION, LIABILITY OF HOSPITAL FOR INJURY TO PERSON INVITED OR PERMITTED TO ACCOMPANY PATIENT DURING EMERGENCY ROOM TREATMENT, 90 A.L.R. 4th 478 (the cited annotation does *not* include any cases in which the Good Samaritan Act's immunity was invoked).

**5.** *Thompson v. Presbyterian Hosp., Inc.,* Okl., 652 P.2d 260, 262 (1982); *Martin v. Stratton,* Okl., 515 P.2d 1366, 1368 (1973); *Steiger v. Commerce Acceptance of Oklahoma City, Inc.,* Okl., 455 P.2d 81, 86 (1969).

**6.** *Thompson, supra* note 5 at 262; *Fletcher v. Meadow Gold Co.,* Okl., 472 P.2d 885, 888 (1970); *Martin, supra* note 5 at 1368.

**7.** Although the common law casts *no* duty on anyone to *prevent a third person from causing physical harm to another,* this court has come to recognize an *exception* whenever a *relationship between the parties imposes some special responsibility. Wofford v. Eastern State Hosp.,* Okl., 795 P.2d 516, 518 (1990); *see* RESTATEMENT (SECOND) OF TORTS § 315 (1965).

**8.** *Union Pac. Ry. Co. v. Cappier,* 66 Kan. 649, 72 P. 281, 283 (1903). *Union* teaches that this absence of duty "*excludes* from actionable negligence all failures to observe the obligations imposed by *charity, gratitude, generosity and the*

*kindred virtues.*" According to *Union* "the moral law would obligate an attempt to rescue a person in a perilous position—as a drowning child—but *the law of the land does not require it, no matter how little personal risk it might involve, provided that the person who declines to act is not responsible for the peril.*" [Emphasis supplied.]

*See* RESTATEMENT (SECOND) OF TORTS §§ 4 and 314 (1965). Section 4 states:

The word 'duty' is used throughout the Restatement of this Subject to denote the fact that the actor is required to conduct himself in a particular manner at the risk that if he does not do so he becomes subject to liability to another *to whom the duty is owed* for any injury sustained by such other, of which that actor's conduct is a legal cause. [Emphasis supplied.]

Section 314 states:

The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection *does not of itself impose upon him a duty to take such action.* [Emphasis supplied.]

**9.** *See* RESTATEMENT (SECOND) OF TORTS § 323 (1965), which states:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking.

■ Oklahoma adopted the Good Samaritan Act,[10] 76 O.S.1991 § 5,[11] in 1963. It abrogates the common-law rescue doctrine for medical providers in an effort to *encourage* them to risk helping strangers in need of succor, *even when they have no duty to render aid.*[12] Good Samaritan immunity rests on three elements: (1) the absence of a prior contractual relationship between the rescuer and the injured person, (2) the characterization of the rescuer's act as having been done in good faith, voluntarily and without compensation and (3) the injured person's apparent need of emergency medical aid.[13] Rescue is not limited to any *situs;* it can take place "wherever required." [14] Gross negligence or willful or wanton acts are excluded from statutory protection.[15]

■ As for the Act's applicability, two issues are in dispute: (a) whether the visitor had a prior contractual relationship with the Hospital, which would take him out of the Act's purview, and if not, (b) whether his dizziness created an *emergency* within the meaning of the Act.[16]

**10.** The terms of 76 O.S.1991 § 5(a) first came with the Revised Laws of 1910 as § 988. Its text, which remains unchanged, was included *in toto* in 1963 as § 5(a) of the Good Samaritan Act.

The broad Act shows a history of amendments that *extend* and *clarify* its coverage. For example:

(1) The Act's first generation required that emergency care be rendered "at the scene of an accident or emergency to the victim...." This was later changed to *"wherever required."*

(2) Medical care provider immunity was extended to *nurses* and *surgeons* by a 1965 amendment and to *dentists* in 1969. In 1971 a requirement was added that "no prior contractual relationship exist [between the injured person and the rescuer]" and immunity for *gross* negligence and *willful* or *wanton* acts in rendering emergency care was excluded.

(3) In 1974 immunity was extended to certain persons who *open their homes to those in apparent danger or need of aid.*

(4) The Act's 1979 amendment expanded the types of care which were to be included within its coverage.

For the pertinent terms of the latest generation of the Act, *see supra* note 2.

See, e.g., *Northern Central Railway Co. v. State,* 29 Md. 420 (1868); *Dyche v. Vicksburg S. & P. R. Co.,* 79 Miss. 361, 30 So. 711 (1901). *See also* Annotation, Duty and Liability of One Who Voluntarily Undertakes to Care for an Injured Person, 64 A.L.R.2d 1179 (1959). *See also* Comment (a) to Restatement § 323 which explains that the rescue doctrine applies whether bodily harm results from (a) the defendant's negligent conduct in the manner of his performance of the undertaking, (b) his failure to exercise reasonable care to complete it or (c) his failure to protect the other when he discontinues it.

**11.** 76 O.S.1991 § 5(a)(1). For the Act's pertinent terms, see *supra* note 2.

**12.** Since 1959 all fifty states and the District of Columbia have enacted Good Samaritan laws; by 1983 a total of 109 enactments were in effect. *See* Comment, Good Samaritan Laws—The Legal Placebo: A Current Analysis, 17 Akron L.Rev. 303 (1983). *See also* Annotation, Construction and Application of "Good Samaritan" Statutes, 68 A.L.R. 4th 294, 300 (1989).

**13.** 76 O.S.1991 § 5(a)(1). For the Act's pertinent terms, see *supra* note 2.

**14.** 76 O.S.1991 § 5(a)(1). For the Act's pertinent terms, see *supra* note 2.

**15.** 76 O.S.1991 § 5(a)(1). For the Act's pertinent terms, see *supra* note 2.

**16.** "Medical aid" *for purposes of Good Samaritan immunity can be as non-invasive as rudimentary first aid. See, e.g.,* Rodriguez v. New York City Health & Hospitals Corp., *132 Misc.2d 705, 505 N.Y.S.2d 345 (1986), where a physician took the pulse and heart rate of a neighbor and called for an ambulance. See also* Flynn v. United States, *902 F.2d 1524, 1530 (10th Cir. Utah 1990). There, the driver of a National Park Service truck arrived at the scene of an accident, pulled over to the shoulder, activated the truck's emergency lights, and momentarily turned on the siren. The court held that Utah's Good Samaritan statute covers "any act or omissions [by the rescuer] while rendering or attempting to render assistance" to an injured party.*

*The visitor in this case does* not *urge that the Hospital failed to give him "medical aid". Rather, his position is that he did not receive "emergency care" since he was not in obvious danger of serious bodily harm or death.*

## IV.

### THE RELATIONSHIP BETWEEN HOSPITAL AND VISITOR WAS THAT OF INVITOR/VISITOR, RATHER THAN THAT OF HOSPITAL/PATIENT; NO PRIOR CONTRACTUAL AGREEMENT BETWEEN THE TWO PARTIES DEPRIVES THE HOSPITAL OF ITS GOOD SAMARITAN DEFENSE

■ The Good Samaritan Act's [the Act's] immunity, of course, does not apply in the context of a hospital/patient relationship.[17] Stated another way, no hospital is ever a Good Samaritan vis-à-vis its *own patient.* The statutory immunity stands extended whenever a *contractual stranger*—such as a visitor, whether an invitee, licensee, or trespasser—is assisted in an emergency.[18]

The visitor urges that the childbirth class he attended, and his agreement to pay his wife's hospital expenses with those of his child, transformed his status vis-à-vis the Hospital from one of invitor/visitor to that of hospital/patient. According to the visitor, *any* contract he may have had with the Hospital—even if no hospital/patient relationship was created—took the medical provider out of the Act's ambit and imposed upon it *a duty* actively to render care when he became dizzy in the operating room.

■ Appellate analysis of a demurrer's sustention requires that the record be viewed in the light most favorable to the visitor. He had attended a one-hour class at the Hospital during which he was shown a film depicting a Caesarean-section delivery. After the movie, he and his wife were given a tour of the Hospital's labor and delivery area and of its surgery facilities. He had agreed to pay for hospital services *to be performed for his wife and child but not for him.* We hence conclude that his status was that of a visitor. The record before us shows *no* relationship between the Hospital and the visitor—contractual, status-based, or otherwise—which would confer on the latter the status of a patient and make the statutory Good Samaritan immunity inapposite.

## V.

### THE HOSPITAL'S RESPONSE TO ITS VISITOR'S DIZZINESS FALLS WITHIN THE SWEEP OF THE ACT'S IMMUNITY

■ The visitor would have us give the Act *a highly technical construction.* It would limit the Act's ambit to situations where it is *crystal clear* to the medical provider—at the critical moment when a decision must be made whether to render immediate aid—that failure to act *will inevitably* result in death or serious bodily harm to the stranger. The primary goal of statutory construction is to determine legislative intent.[19] This must be ascertained from the statute's language in light of its general purpose and object.[20] Statutory construction that would lead to an absurdity will be avoided if this can be done without contravening the legislative intent.[21] A

---

17. For immunity to be granted the Act *expressly* requires the absence of a "prior contractual relationship" between rescuer and injured person. Some states have excluded from Good Samaritan immunity medical personnel acting in the course of their ordinary practice or employment. *See, e.g., Colby v. Schwartz,* 78 Cal. App.3d 885, 892, 144 Cal.Rptr. 624, 628 (1978); *Hamburger v. Henry Ford Hospital,* 91 Mich.App. 580, 284 N.W.2d 155, 158 (1979). *See also McKenna v. Cedars of Lebanon Hospital,* 93 Cal. App.3d 282, 155 Cal.Rptr. 631 (1979), where the physician's response was held to be outside the scope of his normal duties and hence within the applicable statutory immunity, even though the emergency occurred in a hospital.

18. 76 O.S.1991 § 5(a)(1). For the Act's pertinent terms, see *supra* note 2.

19. *Midwest City v. Harris,* Okl., 561 P.2d 1357, 1358 (1977); *Lekan v. P & L Fire Protection Co.,* Okl., 609 P.2d 1289, 1292 (1980); *Riffe Petroleum Co. v. Great Nat. Corp., Inc.,* Okl., 614 P.2d 576, 579 (1980); *Hess v. Excise Board of McCurtain County,* Okl., 698 P.2d 930, 932 (1985); *Humphrey v. Denney,* Okl., 757 P.2d 833, 835 (1988); *Ledbetter v. Alcoholic Bev. Laws Enforcement,* Okl., 764 P.2d 172, 179 (1988).

20. *See* the authorities cited *supra* note 19.

21. *Ledbetter, supra* note 19 at 179; *Le Flore v. Reflections of Tulsa, Inc.,* Okl., 708 P.2d 1068,

reasonable and rational construction is preferred.[22]

■ The legislature has afforded immunity from liability for negligence to all those health care providers who, while *not* contractually bound to assist an injured person, render, or attempt to render, care in good faith whenever someone *appears* to be in need of immediate medical attention.[23] The legislature has obviously balanced a *victim's need* to be compensated for bodily harm inflicted by another's negligent rescue attempt *against* the *public interest* in encouraging medical providers to render aid in settings in which they might otherwise not feel safe to act. *In the legislative judgment, providing an incentive for medical intervention in an emergency doubtless became a much higher priority than that of an injured person's competing interest in compensation.* Our reading of the text must be both mindful of and faithful to this goal.

■ Keeping in mind that the Act's purpose is to invite medical providers to *intervene*, the term "emergency" must be given the broadest sense possible. The threat of a malpractice suit for one's failure correctly to diagnose the seriousness of potential harm to a stranger—based upon a gauge of perfect hindsight—would seriously undercut, if not indeed destroy, the immunity's effectiveness. *Within the Act's intended meaning an emergency occurs whenever a stranger appears (or may be perceived) to be ill or in need of succor.*

1075 (1985); *Johnson v. Johnson,* Okl., 674 P.2d 539, 542 (1983); *Texas County Irrigation v. Cities Service Oil Co.,* Okl., 570 P.2d 49, 51 (1977).

**22.** *Ledbetter, supra* note 19 at 179; *Le Flore v. Reflections of Tulsa, Inc., supra* note 21 at 1075; *Johnson, supra* note 21 at 542.

**23.** The statute requires no more than that the *rescuer perceive in good faith that there is an emergency.* 76 O.S.1991 § 5(a)(1). For the Act's pertinent terms, see *supra* note 2.

**24.** The nurse expressed *no* opinion as to the presence of an emergency. Rather, her testimony was that the Hospital did not handle the matter in accordance with the *standards of hospitals in Oklahoma.* She testified that "Mr.

■ The visitor's dizziness occurred in the operating room; he was holding his wife's hand while she was being anesthetized for surgery. The testimony of a nurse who was an expert witness for the visitor, if taken as true, does not elevate the presence of emergency to a disputed fact issue.[24] The medical provider need not have waited before rendering aid to see if the visitor would suffer total collapse. The Hospital was clearly within the Act's protection when its personnel escorted the visitor out of the surgery area, seated him on the bed in the hallway, and then redirected their attention to the wife.

### SUMMARY

The trial court did not err by giving judgment to the Hospital upon sustaining its demurrer to the visitor's evidence. *The visitor had no prior contractual relationship with the Hospital which would make him a patient and thus take him out of the range of the Hospital's statutory immunity.* The Hospital was clearly responding to an *apparent emergency* that called for *immediate action.*

**THE COURT OF APPEALS' OPINION IS VACATED AND THE TRIAL COURT'S JUDGMENT REINSTATED AND AFFIRMED.**

HODGES, C.J., LAVENDER, V.C.J., and SIMMS, HARGRAVE and WATT, JJ., concur.

ALMA WILSON, J., concurs in part and dissents in part.

Jackson went to view his wife's delivery, and while he was in the delivery room, he got to feeling a little lightheaded. One of the nurses noticed this and he was escorted to a gurney in the hallway, just outside the room. There, he was placed on the gurney with the rails down. From my understanding, he fell off the gurney, does not remember how he fell, and ended up hurting his face on the floor." Her assessment was that "[i]f they could not attend to him, then they should have sat him on the floor there in the delivery room. If they were going to take him out to the gurney, then they should have put the side rails up so he could not have fallen off." *At most, this testimony reveals that the nurse ascribed negligence to the manner in which aid was provided.*

KAUGER, J., concurs in part and dissents in part, and joins the dissent by SUMMERS, J.

SUMMERS, J., dissents.

SUMMERS, Justice, dissenting:

The Court of Appeals held the Good Samaritan statute inapplicable as a matter of law. This Court goes to the other extreme and *applies* the statute as a matter of law. Under the facts of this case I would let the jury decide, and here is why.

A demurrer was sustained at the close of plaintiff's presentation of evidence. The test of a demurrer to plaintiff's evidence requires the trial court to "accept as true all of the plaintiff's evidence and reasonable inferences therefrom while disregarding conflicting evidence favorable to the defendant." *Blood v. R & R Engineering Inc.*, 769 P.2d 144, 145 (Okla.1989). A demurrer should not be sustained unless there is an entire absence of proof tending to show a right to recover. *Downing v. First Bank in Claremore*, 756 P.2d 1227, 1229 (Okla.1988). Every fact favorable to the plaintiff, together with all reasonable inferences, is admitted as true when considering a demurrer. *Thompson v. Presbyterian Hosp Inc.*, 652 P.2d 260, 262 (Okla. 1982).

The Good Samaritan statute protects a health-care provider who volunteers help "under *emergency circumstances* that suggest the giving of aid is the only alternative to probable death or serious bodily injury." 76 O.S.1991 § 5(a)(1) (emphasis mine). A bright-line rule as to just when an emergency occurs is not feasible, according to *Breazeal v. Henry Mayo Newhall Mem. Hosp.*, 234 Cal.App.3d 1329, 286 Cal.Rptr. 207, 213 (1991):

> An emergency within the meaning of the Good Samaritan statutes exists when there is an urgent medical circumstance of so pressing a character that some kind of action must be taken ... It would seem obvious that in determining whether a patient's condition constitutes such

an emergency the trier of fact must consider the gravity, the certainty, and the immediacy of the consequences to be expected if no action is taken. However, beyond observing that these are the relevant considerations, the variety of situations that would qualify as emergencies under any reasonable set of criteria is too great to admit of anything approaching a bright line rule as to just how grave, how certain, and how immediate such consequences have to be. (Citations omitted).

The standard for considering a demurrer requires us to look at all the evidence favorable to Plaintiff to see if there is an entire absence of proof which would allow recovery. Plaintiff presented evidence by the testimony of a nurse, which if taken as true, would support a finding that there was not an emergency.[1] Moreover, Plaintiff was not required to prove the negative of those elements required by the statute. Rather, the Good Samaritan statute is a defense to the claim, the applicability of which must be shown by the hospital. *See West Nichols Hills Presbyterian Church v. Folks*, 276 P.2d 255, 259 (Okla.1954). The hospital, if allowed to present its evidence, would likely be able to offer testimony that the situation *was* of an emergency nature, and that the statute should afford protection. All 50 states have some form of a Good Samaritan statute, and there is ample authority that its applicability as to whether an emergency existed or not may be a question of fact for the jury. *Eoff v. Hal & Charlie Peterson Foundation*, 811 S.W.2d 187, 192 (Tex.Ct.App.1991); *Markman v. Kotler*, 52 A.D.2d 579, 382 N.Y.S.2d 522, 523 (N.Y.App.Div.1976).

There is a reason unique to this case for letting a jury decide if there was an emergency. Webster defines emergency as "an *unforeseen* combination of circumstances or the resulting state that calls for immediate action." Webster's Ninth New Collegiate Dictionary (emphasis mine). The ma-

---

1. Nurse Botite testified that just because one gets lightheaded it does not mean he is going to pass out.

jority today by declaring an emergency as a matter of law has pronounced the young husband's fainting spell unforeseeable! Would it be preposterous for a factfinder to conclude that indeed a fair percentage of men will *predictably* become light-headed while observing their mate give birth by way of caesarean? If a man is in that room at the hospital's invitation, does not the hospital possibly have some duty to *foresee* a fainting spell, and to render appropriate care if it occurs? I believe these are issues that could and should be sorted out by a jury. Therefore I respectfully dissent.

I am authorized to state that Justice KAUGER joins in these views.