2001 ND 91

**Nicki A. McDOWELL and Charles W. McDowell, Plaintiffs and Appellants,**

v.

**James GILLIE and Florence Swanson, Defendants and Appellees.**

**No. 20000269.**

Supreme Court of North Dakota.

May 22, 2001.

Shane D. Peterson (submitted on brief), Crowley, Haughey, Hanson, Toole & Dietrich, P.L.L.P., Williston, ND, for plaintiffs and appellants.

Gary R. Wolberg (submitted on brief), Fleck, Mather & Strutz, Bismarck, ND, for defendants and appellees.

KAPSNER, Justice.

[¶ 1] Nicki A. and Charles W. McDowell appealed from a summary judgment dismissing their negligence action against James Gillie and Florence Swanson. We conclude there are genuine issues of material fact whether Gillie and Swanson are entitled to immunity under the Good Samaritan Act, N.D.C.C. ch. 32–03.1, and we reverse and remand for further proceedings.

I

[¶ 2] While returning to their home in Manitoba, Canada on February 10, 1996, the McDowells encountered blizzard-like driving conditions as they traveled on Interstate 29 through North Dakota. Falling snow and strong northwest winds caused occasional "white-outs," and Interstate 29 was slippery from ice and compacted snow. As the McDowells neared Buxton in their leased Ford Contour, they saw a semi-tractor and trailer jackknifed in the ditch along the driving lane and stopped to determine whether the truck occupants needed any assistance. While the McDowells' car was stopped, it was struck from behind by a Chevrolet Blazer driven by Bryan Martens. After Charles got out of the car, talked briefly with Martens and exchanged insurance information with him, Charles began walking back to his car and Martens continued on his journey. The McDowell vehicle, which was "banged up" on the passenger side, had been pushed forward between 15 and 20 feet to a point across from the front of the jackknifed semi-tractor and trailer.

[¶ 3] Before Charles got back to his car, a second semi-tractor and trailer, operated by Gillie, who was employed by Swanson, came upon the scene and stopped near Charles. Gillie had a passen-

ger with him whose window was rolled down. The passenger asked "if everything was okay." Charles said they were "fine" and Gillie should move on because "there was no sense making the accident any worse than it already was." Gillie began to leave, but his tractor-trailer slid backwards toward the McDowell vehicle, in which Nicki had remained, and pinned it between Gillie's trailer and the jackknifed semi-tractor and trailer already in the ditch. Charles ran into the ditch to avoid Gillie's truck.

[¶ 4] The McDowells settled with Martens for injuries sustained from the first collision. In September 1998, the McDowells brought this action against Gillie and Swanson seeking to recover damages for personal injuries allegedly suffered from the second accident. After Gillie and Swanson filed a motion for summary judgment, the trial court requested supplemental briefs addressing whether the Good Samaritan Act, N.D.C.C. ch. 32–03.1, barred the McDowells' action. The trial court concluded that, because "Gillie stopped to see if anyone at the accident scene needed help," the McDowells' action was, as a matter of law, barred by the Good Samaritan Act. The McDowells appealed from the summary judgment dismissing their action.

## II

[¶ 5] The McDowells argue summary judgment was inappropriately granted in this case. Summary judgment under N.D.R.Civ.P. 56 is a procedural device for promptly disposing of a lawsuit without trial if, after viewing the evidence in the light most favorable to the nonmoving party, there are no genuine issues of material fact or conflicting inferences which can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. *Snortland*

*v. State,* 2000 ND 162, ¶ 10, 615 N.W.2d 574. A question of fact becomes a question of law only when a reasonable person can draw a single conclusion from the evidence. *Spring Creek Ranch, LLC v. Svenberg,* 1999 ND 113, ¶ 17, 595 N.W.2d 323.

## A

[¶ 6] Under the common law rule, a bystander generally has no duty to provide affirmative aid to an injured person, even if the bystander has the ability to help, unless there exists some relationship between the parties that creates a special responsibility to render assistance not owed to the general public. *See Lundy v. Adamar of New Jersey, Inc.,* 34 F.3d 1173, 1178 (3rd Cir.1994); *see also South v. National Railroad Passenger Corp.,* 290 N.W.2d 819, 837 (N.D.1980) (holding "a person who knows or has reason to know that his conduct, whether tortious or innocent, has caused harm to another has an affirmative duty to render assistance to prevent further harm"). "[T]he law has persistently refused to recognize the moral obligation of common decency and common humanity, to come to the aid of another human being who is in danger, even though the outcome is to cost him his life." W. Prosser, *Law of Torts* § 56, at 340 (4th ed.1971) (footnote omitted) (*"Prosser"*). Furthermore, if one voluntarily undertakes to rescue or render aid to a stranger, the rescuer is liable for any physical harm that results from the failure to exercise reasonable care. *See Jackson v. Mercy Health Center, Inc.,* 864 P.2d 839, 842 (Okla.1993); *Alston v. Blythe,* 88 Wash.App. 26, 943 P.2d 692, 698 (1997); *Restatement (Second) of Torts* § 323 (1965). "The result of all this is that the good Samaritan who tries to help may find himself mulcted in damages, while the priest and the Levite who pass by on the other side go on their cheerful way rejoicing." *Prosser* § 56, at 344. In an attempt to eliminate the per-

ceived inadequacies of the common law rules, all states have enacted some form of Good Samaritan legislation to protect individuals from civil liability for any negligent acts or omissions committed while voluntarily providing emergency aid or assistance. *See* Annot., *Construction and application of "Good Samaritan" statutes,* 68 A.L.R.4th 294, 299–300 (1989).

[¶ 7] For many years, North Dakota provided immunity to limited segments of the public for care or services given at the time of an emergency. *See, e.g.,* N.D.C.C. § 23–27–04.1 (exempting from liability persons who provide volunteer prehospital emergency medical services); N.D.C.C. § 32–03–40 (exempting from liability firemen, policemen and peace officers who render emergency care); N.D.C.C. § 32–03–42 (exempting from liability licensed health care service providers who voluntarily provide health care service without compensation for amateur athletes or at amateur athletic events). Only N.D.C.C. § 39–08–04.1 exempted from liability "[a]ny person who is an unpaid volunteer" and who renders emergency care or services, but those services had to be rendered "at or near the scene of an accident, disaster, or other emergency...." In 1987, the Legislature enacted the Good Samaritan Act, N.D.C.C. ch. 32–03.1, to broaden the class of individuals entitled to immunity and to broaden the types of emergencies covered. *See Hearing on H.B. 1631 Before the Senate Judiciary Committee,* 50th N.D. Legis. Sess. (March 16, 1987) (testimony of Rep. Janet Wentz).

[¶ 8] North Dakota's Good Samaritan Act bars actions against persons who render aid or assistance to others under certain circumstances:

No person, or the person's employer, subject to the exceptions in sections 32–03.1–03, 32–03.1–04, and 32–03.1–08, who renders aid or assistance necessary or helpful in the circumstances to other persons who have been injured or are ill as the result of an accident or illness, or any mechanical, external or organic trauma, may be named as a defendant or held liable in any personal injury civil action by any party in this state for acts or omissions arising out of a situation in which emergency aid or assistance is rendered, unless it is plainly alleged in the complaint and later proven that such person's acts or omissions constituted intentional misconduct or gross negligence.

N.D.C.C. § 32–03.1–02. "Aid or assistance necessary or helpful in the circumstances" is statutorily defined to mean:

any actions which the aider reasonably believed were required to prevent death or serious permanent injury, disability or handicap, or reasonably believed would benefit the injured or ill person, depending upon the aider's perception of the nature and severity of the injury or illness and the total emergency situation, and that the aider reasonably believed the aider could successfully undertake.

N.D.C.C. § 32–03.1–01(1). "Gross negligence" is defined to mean "acts or omissions falling short of intentional misconduct which nevertheless show a failure to exercise even slight care or any conscious interest in the predictable consequences of the acts or omissions." N.D.C.C. § 32–03.1–01(4).

[¶ 9] The McDowells argue the trial court erred because merely stopping at the scene of an automobile accident and inquiring whether any assistance is needed does not, as a matter of law, constitute rendering aid or assistance within the meaning of the Good Samaritan Act. The McDowells also argue in the alternative that summary judgment was improper because it is unclear what Gillie's intentions were when he

stopped the semi-tractor and trailer on the highway.

### B

[¶ 10] We reject the McDowells' contention that the act of stopping on the side of the road at the scene of an accident to inquire whether any assistance is required cannot constitute rendering aid or assistance under the Good Samaritan Act.

[¶ 11] The interpretation of a statute is a question of law, fully reviewable on appeal. *Berg v. Berg,* 2000 ND 36, ¶ 24, 606 N.W.2d 895. Our primary objective in construing a statute is to ascertain the intent of the Legislature by looking at the language of the statute itself and giving it its plain, ordinary, and commonly understood meaning. *State ex rel. Heitkamp v. Family Life Services, Inc.,* 2000 ND 166, ¶ 7, 616 N.W.2d 826. Although courts may resort to extrinsic aids to interpret a statute if it is ambiguous, we look first to the statutory language, and if the language is clear and unambiguous, the legislative intent is presumed clear from the face of the statute. *Overboe v. Farm Credit Services,* 2001 ND 58, ¶ 9, 623 N.W.2d 372. In interpreting a statute, we presume the Legislature did not intend an absurd or ludicrous result or unjust consequences. *Fleck v. ANG Coal Gasification Co.,* 522 N.W.2d 445, 454 (N.D.1994). Rather, statutes are to be construed in a practical manner. *Huber v. Oliver County,* 1999 ND 220, ¶ 16, 602 N.W.2d 710. We give consideration to the context of the statutes and the purposes for which they were enacted. *Falcon v. State,* 1997 ND 200, ¶ 9, 570 N.W.2d 719.

[¶ 12] The Good Samaritan Act immunizes from liability a person "who renders aid or assistance necessary or helpful in the circumstances to other persons who have been injured or are ill as the result of an accident ... or any mechanical ... trauma." N.D.C.C. § 32–03.1–02. To "render" means either "[t]o give or *make available*." *The American Heritage Dictionary* 1046 (2d College ed.1985) (emphasis added). "Aid or assistance necessary or helpful in the circumstances" is broadly defined as *"any actions which the aider reasonably believed were required to prevent death or serious permanent injury, disability or handicap, or reasonably believed would benefit the injured or ill person, depending upon the aider's perception of the nature and severity of the injury or illness and the total emergency situation, ..."* N.D.C.C. § 32–03.1–01(1) (emphasis added). Therefore, immunity is provided for persons who make available to an injured person assistance through any actions, short of intentional misconduct or gross negligence, which they reasonably believe would benefit the injured person based on their perceptions of the nature of the injury and the total emergency situation.

[¶ 13] The obvious purpose of the Good Samaritan Act is to encourage those who do not have a preexisting duty to voluntarily act in times of emergency by limiting the threat of civil liability for the actions taken. *See, e.g., Tiedeman By and Through Tiedeman v. Morgan,* 435 N.W.2d 86, 89 (Minn.App.1989). Stopping at the scene of an accident to assess an apparent emergency situation and to learn whether assistance is required will normally be the first action taken by a person willing to help if the circumstances warrant assistance. The McDowells' argument that the Good Samaritan Act does not apply until life-saving affirmative action measures are actually undertaken is not supported by the broad statutory language and is inimical to the purpose of the Act. Nor do we find anything in the legislative history of the Act to support such a narrow and technical construction of its

provisions. Persons would be discouraged from making an initial stop to assess whether a life-threatening emergency situation actually exists if immunity from liability attached only after the initial stop and only if an actual emergency existed and required further action.

[¶ 14] We have not found a case directly on point. Cases from other jurisdictions are not particularly helpful in resolving the issue before us because those decisions are necessarily dependent upon the terminology of a specific statute. *See* Annot., 68 A.L.R.4th, at 299. Nevertheless, principles enunciated in some cases support our conclusion.

[¶ 15] In *Jackson v. Mercy Health Center, Inc.*, 864 P.2d 839, 841 (Okla.1993), a husband accompanied his pregnant wife to the operating room of a hospital to comfort her and to observe the baby's delivery by Caesarean section, when he became dizzy while watching preparations for the surgery. Hospital personnel took him by the arm and seated him on his wife's hospital bed outside the surgery room, after which he fell and injured himself. *Id.* The trial court had dismissed the husband's negligence action against the hospital based on Oklahoma's Good Samaritan Act, Okla. Stat. tit. 76, § 5 (1991), which provided immunity to hospital personnel "who, under emergency circumstances that suggest the giving of aid is the only alternative to probable death or serious bodily injury, in good faith, voluntarily and without compensation, render[ ] or attempt[ ] to render emergency care to an injured person or any person who is in need of immediate medical aid...." The Oklahoma Court of Appeals reversed the dismissal, reasoning the husband was not in danger of death or serious bodily harm when hospital personnel came to his aid. *Jackson*, at 841.

[¶ 16] Noting a reasonable and rational construction of statutes is preferred, the Oklahoma Supreme Court reversed the Court of Appeals and rejected the husband's technical construction of the statute which "would limit the Act's ambit to situations where it is *crystal clear* to the medical provider—at the critical moment when a decision must be made whether to render immediate aid—that failure to act *will inevitably* result in death or serious bodily harm to the stranger." *Jackson*, 864 P.2d at 844 (emphasis in original). The Oklahoma Supreme Court reasoned:

Keeping in mind that the Act's purpose is to invite medical providers to *intervene*, the term "emergency" must be given the broadest sense possible. The threat of a malpractice suit for one's failure correctly to diagnose the seriousness of potential harm to a stranger—based upon a gauge of perfect hindsight—would seriously undercut, if not indeed destroy, the immunity's effectiveness. *Within the Act's intended meaning an emergency occurs whenever a stranger appears (or may be perceived) to be ill or in need of succor.*

The [husband's] dizziness occurred in the operating room; he was holding his wife's hand while she was being anesthetized for surgery.... The medical provider need not have waited before rendering aid to see if the visitor would suffer total collapse. The Hospital was clearly within the Act's protection when its personnel escorted the visitor out of the surgery area, seated him on the bed in the hallway, and then redirected their attention to the wife.

The Hospital was clearly responding to an *apparent emergency* that called for *immediate action.*

*Id.* at 845 (emphasis in original). *Jackson* illustrates that hindsight is not the proper

gauge for determining the existence of an emergency situation.

[¶ 17] In *Flynn v. United States*, 681 F.Supp. 1500, 1507 (D.Utah 1988), *affirmed in part and remanded*, 902 F.2d 1524 (10th Cir.1990), the court construed Utah's Good Samaritan Act, Utah Code Ann. § 78–11–22 (1983), which provided immunity to a "person who renders emergency care at or near the scene of an emergency, gratuitously and in good faith," and defined "emergency" as meaning "an unexpected occurrence involving injury, threat of injury, or illness to a person, including motor vehicle accidents, disasters, and other accidents or events of a similar nature." In *Flynn*, 681 F.Supp. at 1503, National Park Service ("NPS") employees who were driving a truck equipped with emergency lights came upon the scene of an accident, stopped the truck on the shoulder of the road, and activated the emergency lights and siren. Before the NPS employees could get out of their vehicle, a driver who had been following the NPS truck pulled out to the center of the highway after seeing the truck's brake lights flash and struck three women from the vehicles involved in the first accident. *Id.* The court granted summary judgment in favor of the Government, concluding the "NPS employees stopped to render aid at the scene of the [first] accident—an emergency as defined by" the Utah Good Samaritan Act. *Id.* at 1507. The court also rejected the plaintiffs' argument that the Act did not apply because the NPS employees caused the second accident:

> [T]his argument is without foundation. The Good Samaritan Act serves to exonerate any negligent conduct by any person who stops to render aid at the scene of an emergency. Arguably, this statute does not apply if the actor causes the emergency. The facts clearly show that the NPS employees did not cause the [first] accident but, instead, stopped to render aid at the accident scene. Under this statute, any negligent acts or omissions by the NPS employees in stopping to render emergency care at the [first] accident, including the employee's alleged failure to block the scene and negligent activation of the siren, are not subject to civil liability.

> . . . .

> The Government's civil liability to the plaintiffs is to be judged in the context of the emergency existing at the time.

*Id.* at 1508 (footnote omitted). *Flynn* illustrates that stopping at the scene of an accident with the intention of helping, but without rendering actual physical assistance, can constitute rendering emergency care. *See also Rodriguez v. New York City Health & Hospitals*, 132 Misc.2d 705, 505 N.Y.S.2d 345, 347 (Sup.Ct.1986) (holding a physician who arranged for a neighbor to be taken to a hospital rendered emergency treatment at the scene of an accident or other emergency within meaning of the Good Samaritan law).

[¶ 18] We recognize there is caselaw tending to support the McDowells' argument that stopping at the scene of an accident and inquiring whether assistance is needed should not be covered by the Good Samaritan Act. *See, e.g., Buck by Buck v. Greyhound Lines, Inc.*, 105 Nev. 756, 783 P.2d 437, 441 (1989) (holding Good Samaritan law does not apply to provision of emergency care or services to uninjured or healthy persons); *Dahl v. Turner*, 80 N.M. 564, 458 P.2d 816, 824 (App.1969) (holding Good Samaritan law did not apply to person who picked up accident victim who had rolled his car and provided him transportation into the city because such actions did not constitute emergency care within meaning of the statute); *Eoff v. Hal and Charlie Peterson Foundation*, 811 S.W.2d 187, 192 (Tex.App.1991) (holding

the assistance of two persons in transporting an ill woman to the emergency room was not emergency care within meaning of Good Samaritan law); *Howell v. City Towing Associates, Inc.*, 717 S.W.2d 729, 732 (Tex.App.1986) (holding tow truck driver who, while giving accident victim ride home, called his dispatcher to arrange for an ambulance when the victim began exhibiting signs of a "stroke," was not providing emergency care within meaning of Good Samaritan law). To the extent these decisions cannot be distinguished on the bases of the particular statutory provisions involved or their peculiar facts, we find them unpersuasive because the limited and technical definitions given to the concepts of "emergency" and "emergency care" frustrate the purpose of Good Samaritan legislation.

[¶ 19] We conclude the act of stopping at the scene of an accident and inquiring whether any assistance is needed can constitute the rendering of aid and assistance within the meaning of the Good Samaritan Act, N.D.C.C. ch. 32–03.1.

## C

[¶ 20] We nevertheless reverse and remand for trial because genuine issues of material fact exist which preclude the granting of summary judgment in this case.

[¶ 21] Under the terms of the Good Samaritan Act, Gillie had to establish at least one of two things to have rendered aid or assistance necessary or helpful in the circumstances: (1) that Gillie rendered actions which he reasonably believed were required to prevent death or serious injury and he reasonably believed he could successfully undertake; or (2) that Gillie rendered actions which he reasonably believed would benefit an injured or ill person and he reasonably believed he could successfully undertake. Moreover, each alternative must be judged from Gillie's overall perception of the nature and severity of the injury or illness and the total emergency situation. Thus, the statute combines elements of the reasonable person standard as well as the aider's subjective state of mind. Generally, issues involving the reasonable person standard and a person's subjective state of mind are inappropriate for disposition by summary judgment. *See, e.g., Opp v. Source One Management, Inc.*, 1999 ND 52, ¶ 16, 591 N.W.2d 101; *Burr v. Kulas*, 532 N.W.2d 388, 393 (N.D. 1995). Additionally, when the nature of an emergency situation is not clearly apparent, the question whether there existed an emergency situation that warranted application of a Good Samaritan law has been held to be an issue of fact not amenable to summary judgment disposition. *See Travers v. Vaz*, 714 A.2d 603, 604 (R.I.1998).

[¶ 22] In this case, the trial court found "it is uncontroverted, based upon [Charles] McDowell's own deposition testimony, that Gillie stopped his truck at the accident scene to determine whether anybody needed help." However, Gillie and Swanson presented no direct evidence showing Gillie's state of mind or why he stopped the truck. There is no affidavit, deposition testimony, or other evidence from Gillie addressing these questions. At most, the facts show Gillie stopped the truck, the passenger's window was rolled down, and the passenger asked whether everything was okay. Although Charles testified Gillie "stopped to see if everything was okay," Charles further testified he did not talk to the driver of the truck and he believed the passenger had his window rolled down because "he was trying to see the side of the road, I don't know."

[¶ 23] Besides the lack of direct evidence of Gillie's intentions and state of mind, other reasonable inferences could be drawn from Gillie's act of stopping the

truck. Gillie's passenger may have had the window rolled down in an effort to maintain eye contact with the side of the road for navigational purposes. Alternatively, Gillie may have seen the initial accident and slowed the truck as a precautionary measure, and because of the icy conditions, wind, and slow speed, he was unable to continue and simply stopped at a point near Charles. Other reasonable inferences could be drawn.

[¶ 24] Moreover, even if Gillie stopped the truck to ask whether everything was okay, there is no evidence Gillie actually intended to provide aid or assistance, or to what extent he would have been willing and able to provide assistance if assistance was needed. Nor is there evidence Gillie believed he could reasonably undertake any required actions even if he, in fact, intended to provide them. The trial court's opinion does not address the reasonableness of Gillie's beliefs, which is a statutory prerequisite for immunity.

[¶ 25] Undoubtedly, there will be cases in which immunity under the Good Samaritan Act can be determined under summary judgment standards. This is not such a case. A reasonable person could draw more than one conclusion from the evidence in the record. Under the unique circumstances of this case, we conclude there are genuine issues of material fact whether Gillie and Swanson are entitled to immunity under the Good Samaritan Act, and the trial court erred in granting summary judgment dismissing the McDowells' action.

### III

[¶ 26] We reverse the summary judgment and remand for further proceedings.

[¶ 27] DALE V. SANDSTROM, WILLIAM A. NEUMANN, and MARY MUEHLEN MARING, JJ., concur.

VANDE WALLE, Chief Justice, concurring in the result.

[¶ 28] Every case in which a person stops to render aid at the scene of an accident does not create a question of fact as to the intent of the person who stops. To that extent I disagree with the McDowells that "merely stopping at the scene of an automobile accident and inquiring whether any assistance is needed does not, as a matter of law, constitute rendering aid or assistance within the meaning of the Good Samaritan Act."

[¶ 29] Because of my concern that each time the Good Samaritan law is invoked as a defense the plaintiffs will attempt to argue the defendants' real intent in stopping, I am skeptical that a factual issue as to the defendants' intent in stopping exists in this case. However, a passenger asking if "everything was okay" is sufficiently ambiguous as to the driver's purpose for stopping and I reluctantly concur in the result reached by the majority. The moral of our opinion today, apparently, is that a person stopping at the scene of an accident intending to render aid or necessary or helpful assistance should immediately announce, "I am here to help," notwithstanding the cynical meaning given to those words in other contexts.

[¶ 30] GERALD W. VANDE WALLE, C.J.