2005 OK CIV APP 104

ESTATE OF Hwan YOUN, Deceased, acting through its Personal Representative, Gregory Johnson, and Judy Youn, as Surviving Spouse, Plaintiffs/Appellants,

v.

Gary Paul KULA, M.D., individually, and as agent of defendant hospital, Defendant/Appellee,

Mercy Memorial Health Center, Inc., an Oklahoma corporation, d/b/a Mercy Memorial Hospital of Ardmore, Defendant.

No. 101,787.

Court of Civil Appeals of Oklahoma, Division No. 3.

Nov. 10, 2005.

---

Paul E. Quigley, Derryberry, Quigley, Solomon & Naifeh, Oklahoma City, OK, for Appellants.

Stephen Peterson, Michael S. McMillin, Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, OK, for Appellees.

Opinion by LARRY JOPLIN, Presiding Judge.

¶1 Plaintiffs/Appellants Estate of Hwan Youn, Deceased, acting through its Personal Representative, Gregory Johnson, and Judy Youn, as Surviving Spouse (Plaintiffs), seek review of the trial court's order granting judgment to Defendant/Appellee Gary Paul Kula, M.D. (Kula) on Plaintiffs' negligence claims. In this proceeding, Plaintiffs assert the trial court erred as a matter of law in holding their claim barred by the Oklahoma Good Samaritan Act, 76 O.S. § 5. Having reviewed the record, however, we discern no error.

¶2 Decedent was a radiologist, and experienced some apparently serious marital discord with his wife. After the report of his arrest on allegations of spousal abuse appeared in a local newspaper, Decedent's partner in practice asked him to resign.

¶3 Decedent became depressed and began drinking heavily.[1] On Saturday, January 1, 2000, Dr. Jason Smotherman, also a physician and Decedent's neighbor, became concerned for Decedent's mental state and safety on the reports of his drinking binge and threats of suicide.

¶4 Kula is a psychiatrist, one of two then in practice at Behavior Health Associates, an entity owned by Defendant Mercy Memorial Hospital (Hospital). Dr. Smotherman called Kula and asked him, as a professional courtesy and favor, to come speak with Decedent.

¶5 When Smotherman called, Kula was at a restaurant eating lunch with his wife. Although he was not on-call at the Hospital that day,[2] and was under no employment-related obligation to respond, Kula (accompanied by his wife) went to Decedent's home. Kula spoke to Decedent for about an hour and a half. At the conclusion of their discussion, Kula prescribed valium to alleviate any alcohol withdrawal and help Decedent sleep, and with the aid of others, removed all alcohol, sharp objects and other medication they could find from Decedent's home.

---

1. Suggested during discovery at one-fifth of a gallon per day for about one week.

2. There was another psychiatrist on-call.

¶ 6 On his understanding that Decedent would be attended by friends, Kula then left Decedent's residence with plans to see Decedent again on the following Monday. On his way home, Kula stopped and spoke with Decedent's mother-in-law to "get some background information."

¶ 7 Later on Saturday evening, Dr. Smotherman again summoned Kula to Decedent's home when Decedent refused to take his medication. Kula responded, and again spoke with Decedent for another hour and a half. Decedent then took his medication and went to sleep. The following day, however, Decedent committed suicide.

¶ 8 Plaintiffs subsequently commenced the instant action against Kula and Hospital, attributing the cause of Decedent's death to Kula's negligence, and Kula's negligent hiring and retention by Hospital. Kula and Hospital answered, denying the allegations of Plaintiffs' petition generally and specifically, and asserted defenses, including "immun[ity] from any liability in this matter pursuant to Oklahoma Statutes, including but not limited to," 76 O.S. § 5.

¶ 9 Kula and Hospital filed a motion for summary judgment, to which was attached the affidavits of Kula and Dr. Smotherman establishing the facts we have recounted. Kula also attested that he "came to the aid" of Decedent voluntarily, in good faith, with no prior relationship with Decedent or expectation of payment, and provided "emergenc[y] care that . . . was appropriate, nonnegligent and beneficial." Dr. Smotherman attested that, at his request, and "as a professional courtesy and favor, Dr. Kula traveled to [Decedent's] house," and that, based on his personal observations throughout both meetings between Kula and Decedent, "Dr. Kula's interaction with" Decedent was "proper," "adequate, thorough and beneficial." Additionally, said Defendants, Hospital bore no vicarious liability for the acts of Kula, insulated from personal liability by the Good Samaritan Act, 76 O.S. § 5.

¶ 10 Plaintiffs responded, objecting to summary judgment. To their response, Plaintiffs attached the affidavit of an expert,[3] attesting that, "where Good Samaritan immunity is broad, it is generally understood by physicians and mental-health professionals as protective only when the presence of a doctor at the scene of a medical emergency is coincidental." Plaintiff's expert also attested that Good Samaritan immunity "does not apply to acute psychiatric care, where the psychiatrist is, as Dr. Kula admits, acting as a consultant, . . ., nor in situations where the initial consultation is followed up by subsequent care in the presence of an available alternative," particularly, referral to the available on-call psychiatrist at the Hospital, and where, as in the present case, the psychiatrist "took it upon himself to provide continuity of care, including additional visits, family interviews, medication prescription, and referral to see him the following Monday." The expert ultimately opined that Kula's actions in dealing with Decedent "could . . . rise to the level of gross negligence," and "it may also be determined that Dr. Kula's negligent acute psychiatric care was the direct and proximate psychiatric cause of [Decedent's] suicide the next day."

¶ 11 On consideration of the briefs and evidentiary materials, the trial court granted Defendants' motion for summary judgment on Plaintiffs' claims against Hospital, finding "no reasonable interpretation of the evidence" would support the conclusion "that at the times pertinent to this action defendant Kula was acting as the employee, agent or servant of" Hospital. However, the trial court denied Defendants' motion for summary judgment on Plaintiffs' claims against Kula, finding "that whether defendant Kula exercised slight care in his care of [Decedent] is a material fact about which genuine controversy exists." The trial court consequently held "that a trial against defendant Kula will proceed to determine if defendant Kula

---

**3.** An Associate Clinical Professor of Psychiatry and Co–Director of the program in Psychiatry and the Law, Harvard Medical School, "familiar with the standard of care in the specialty of psychiatry," and "medical emergency care, including psychiatric emergency care[,] acute psychiatric care, and care delivered in a variety of settings and circumstances ranging from Good Samaritan care in medical emergencies to coverage and consultation in acute medical and psychiatric care, with or without the expectation of remuneration."

exercised slight care when he rendered care for" Decedent.

¶ 12 Prior to trial, Plaintiffs filed an "Admission of Fact," admitting that they "ha[d] no evidence to establish that … Kula … failed to exercise slight care when rendering assistance to the deceased, i.e., that the defendant was grossly negligent." The parties thereafter appeared for non-jury trial, and the trial court granted judgment to Kula, finding:

> 1. In the admitted absence of evidence that the defendant failed to exercise slight care, plaintiffs are unable to prove a *prima facie* case against the defendant; and
>
> 2. The parties have agreed that nothing in this admission of fact and finding by this court will preclude an appeal of any issue arising from previous orders and findings of fact as already determined by this court.
>
> 3. Judgment should therefore be entered in favor of [Kula], and against the plaintiffs as the Good Samaritan Act bars plaintiffs' claims.

(Emphasis original.)

¶ 13 Plaintiffs now appeal, asserting "the trial court erred in ruling on Summary Judgment that [Kula's] actions fall under the Good Samaritan Rule, and that, consequently, Plaintiff must prove lack of slight care." The matter stands submitted for accelerated review on the trial court record.

■ ¶ 14 "Summary judgment is appropriate only where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Wathor v. Mutual Assur. Adm'rs, Inc.,* 2004 OK 2, ¶ 4, 87 P.3d 559, 561. (Citation omitted.) "A defendant who moves for summary judgment by interposing an affirmative (absolute) defense against liability must show that there is no substantial controversy over the applicable facts that are material to that defense and that all inferences which may be reasonably drawn from undisputed facts tendered are in the moving party's favor." *Hughey v. Grand River Dam Authority,* 1995 OK 56, ¶ 8, 897 P.2d 1138, 1143. "[O]ur standard of review of a trial court's grant of summary judgment is de novo." *Wathor,* 2004 OK 2, ¶ 4, 87 P.3d at 561. (Citation omitted.)

¶ 15 The Oklahoma Good Samaritan Act provides in pertinent part:

> (a) Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself, and except as hereinafter provided.
>
> (1) *Where no prior contractual relationship exists, any person licensed to practice any method of treatment* of human ailments, disease, pain, injury, deformity, *mental* or physical *condition,* or licensed to render services ancillary thereto, including licensed registered and practical nurses, who, *under emergency circumstances* that suggest the giving of aid is the *only alternative to probable death or serious bodily injury, in good faith, voluntarily and without compensation,* renders or attempts to render emergency care to an injured person or any person who is in need of immediate medical aid, *wherever required,* shall not be liable for damages as a result of any acts or omissions except for committing gross negligence or willful or wanton wrongs in rendering the emergency care. …

76 O.S. § 5. (Emphasis added.) Immunity under this section consequently "rests on three elements: (1) the absence of a prior contractual relationship between the rescuer and the injured person, (2) the characterization of the rescuer's act as having been done in good faith, voluntarily and without compensation and (3) the injured person's apparent need of emergency medical aid." *Jackson v. Mercy Health Center, Inc.,* 1993 OK 155, ¶ 6, 864 P.2d 839, 843. In rejecting "a highly technical construction" of the Act as would limit "the Act's ambit to situations where it is *crystal clear* to the medical provider—at the critical moment when a decision must be made whether to render immediate aid—that failure to act *will inevitably* result in death or serious bodily harm to the stranger," the Supreme Court adopted a

broader and more flexible *construction of the* term, "emergency":

The legislature has afforded immunity from liability for negligence to all those health care providers who, while *not* contractually bound to assist an injured person, render, or attempt to render, care in good faith whenever someone *appears* to be in need of immediate medical attention. The legislature has obviously balanced a *victim's need* to be compensated for bodily harm inflicted by another's negligent rescue attempt *against* the *public interest* in encouraging medical providers to render aid in settings in which they might otherwise not feel safe to act. *In the legislative judgment, providing an incentive for medical intervention in an emergency doubtless became a much higher priority than that of an injured person's competing interest in compensation.* Our reading of the text must be both mindful of and faithful to this goal.

Keeping in mind that the Act's purpose is to invite medical providers to *intervene,* the term "emergency" must be given the broadest sense possible. The threat of a malpractice suit for one's failure correctly to diagnose the seriousness of potential harm to a stranger—based upon a gauge of perfect hindsight—would seriously undercut, if not indeed destroy, the immunity's effectiveness. *Within the Act's intended meaning an emergency occurs whenever a stranger appears (or may be perceived) to be ill or in need of succor.*

*Jackson,* 1993 OK 155, ¶¶ 11, 12–13, 864 P.2d at 845. (Emphasis original.) (Footnotes omitted.)

¶ 16 The uncontroverted evidence in the present case demonstrated Kula was a doctor licensed to practice psychiatry, a method for treatment of mental conditions. At the time he was called, Kula was eating lunch at a restaurant with his wife, and took his wife with him to Decedent's home. At the time he spoke to Decedent, Kula had no prior relationship with Decedent, and saw Decedent in good faith, voluntarily and without expectation of compensation. Kula rendered treatment in the "emergency" circumstance of Decedent's threats and/or attempts at suicide, a circumstance in which Decedent appeared "to be ill or in need of succor," and at risk of death or serious bodily harm absent treatment, in this case, by Kula. The Act extends immunity for emergency treatment rendered "wherever required," and Kula rendered emergency treatment to Decedent where required at Decedent's home. Plaintiffs admitted they had "no evidence to establish that ... Kula ... failed to exercise slight care when rendering assistance to the deceased, i.e., that the defendant was grossly negligent."

¶ 17 On these uncontroverted facts, we hold the trial court did not err as a matter of either fact or law in holding Plaintiffs' claim barred by operation of 76 O.S. § 5. The order of the trial court is therefore AFFIRMED.

HANSEN, J., and BUETTNER, C.J., concur.