# United States Court of Appeals
### For the Eighth Circuit

_____

No. 14-1077

_____

In re: Racing Services, Inc.

*Debtor*

------------------------------

PW Enterprises, Inc., a Nevada corporation

*Appellee*

v.

State of North Dakota, a governmental entity; North Dakota Racing Commission,
a regulatory agency; North Dakota Breeders Fund, a special fund; North Dakota
Purse Fund, a special fund; North Dakota Promotions Fund, a special fund

*Appellant*s

_____

Appeal from United States District Court
for the District of North Dakota - Fargo

_____

Submitted: October 6, 2014
Filed: February 20, 2015

_____

Before RILEY, Chief Judge, WOLLMAN and BYE, Circuit Judges.

_____

RILEY, Chief Judge.

North Dakota, the North Dakota Racing Commission, and three special funds administered by the commission (collectively, state) appeal from a district court[1] decision reversing the bankruptcy court's grant of summary judgment to the state against PW Enterprises, Inc. (PWE)—the largest non-governmental creditor of Racing Services, Inc. (RSI), formerly a state-licensed horse racing simulcast service provider. After RSI filed bankruptcy, PWE derivatively brought this suit on behalf of all creditors to recover the money the state collected from RSI as taxes on parimutuel[2] account wagering. See In re Racing Servs., Inc., 540 F.3d 892, 901-02 (8th Cir. 2008). On appeal, the district court concluded "[t]he money collected from RSI in the form of taxes on account wagering must be returned to the bankruptcy estate" because North Dakota law did not authorize the state "to collect taxes on account wagering during the time period in question." With appellate jurisdiction under 28 U.S.C. § 158,[3] we affirm.

---

[1]The Honorable Ralph R. Erickson, Chief Judge, United States District Court for the District of North Dakota.

[2]Parimutuel wagering is "a system of betting (as on a horse race) in which those who bet on the winner share the total stakes minus a small percent for the management." See Webster's Third New International Dictionary 1642 (1993).

[3]Under § 158(d)(1), we "have jurisdiction of appeals from all *final* decisions, judgments, orders, and decrees entered" by the district court. (Emphasis added). In reversing the bankruptcy court's judgment for the state, the district court ordered remand to calculate the amount the state must return to the bankruptcy estate, but the state appealed before remand. See In re Vekco, Inc., 792 F.2d 744, 745 (8th Cir. 1986) ("[A] district court decision involving remand normally will not be considered final for purposes of appeal to this court."). We may consider "a decision requiring remand . . . final if the district court has effectively resolved the merits of the controversy, and on remand all that remains is a purely mechanical, computational, or in short, ministerial task, whose performance is unlikely to generate a new appeal or to affect the issue that the disappointed party wants to raise on appeal from the

## I.   BACKGROUND[4]

In 1987, the North Dakota legislature authorized parimutuel betting for live horse races in North Dakota. See N.D. Cent. Code § 53-06.2-10 (1987); 1987 N.D. Laws ch. 618, § 10. In what the state calls the "Takeout Statute," N.D. Cent. Code § 53-06.2-11, the legislature established formulas for deducting from the wager pool to (1) offset the licensed service provider's expenses, and (2) make revenue payments to the state treasurer—i.e., taxes. See 1987 N.D. Laws ch. 618, § 11. The balance of the pool went to the winning bettors. Id. Beginning in 1989, the state allowed "off track" parimutuel wagering for races inside and outside of North Dakota—later reclassified as "simulcast wagering"—and modified the takeout formulas to include this new type of wagering. See N.D. Cent. Code § 53-06.2-10.1 (1989); 1989 N.D. Laws ch. 624, § 8; 1991 N.D. Laws ch. 556, §§ 5, 6.

In 2001, the state legislature authorized "account wagering," which is "a form of parimutuel wagering in which an individual deposits money in an account and uses the account balance to pay for parimutuel wagers." 2001 N.D. Laws ch. 466, § 1. But, as the state concedes, the legislature did not amend § 53-06.2-11 to include deductions for account wagering. Id. The legislature adjusted the takeout formulas in 2003 and 2005, but again did not amend the statute to include account wagering. See 2003 N.D. Laws ch. 452, § 1; 2005 N.D. Laws ch. 469, § 1. In 2007, the legislature amended § 53-06.2-11 to create a new subsection for account wagering and included specific formulas for account wagering that charged, at certain wagering

---

order of remand." Id. (quotation and internal citation omitted). Based on our thorough review of the record and the parties' agreement that a relatively simple mathematical calculation is all that remains for remand, we conclude the district court's order is final within the meaning of § 158(d)(1).

[4]Neither party challenges the bankruptcy court's factual findings for the purposes of this appeal.

-3-

levels, lower rates than live-race wagering and simulcast wagering. See 2007 N.D. Laws ch. 448, § 7, ch. 449, § 2.

RSI, the debtor in this case, was a licensed simulcast service provider that assumed responsibility for paying the required taxes to the state. Starting in 1999, PWE used RSI's services to place a high volume of parimutuel wagers on North Dakota horse races. PWE's bets were very successful. By 2003, PWE had accumulated an account balance at RSI of $2,248,100.86.

In July 2003, when PWE learned RSI was being investigated by the federal government for illegal gaming, PWE stopped betting through RSI and demanded its account balance. PWE also contacted the state to discuss RSI. After several detailed discussions, PWE believed the state would protect PWE's interests, in part to prompt PWE to resume wagering in North Dakota.

On August 21, 2003, the state sued RSI and secured a court-appointed receiver to stabilize the floundering company. PWE originally cooperated with the receiver, but grew dissatisfied with the receiver's performance. When the state, without notice to PWE, drew on an RSI letter of credit secured by a $225,000 certificate of deposit PWE had pledged, the bank liquidated PWE's certificate and paid its funds to the state. PWE felt betrayed. PWE later learned that in the year before RSI filed bankruptcy, the state had also inconspicuously collected $5,270,101.20 in taxes from RSI.

On February 3, 2004, RSI filed a voluntary Chapter 11 reorganization petition, later converted to a Chapter 7 bankruptcy. PWE submitted a proof of claim for the $2,248,100.86 balance of its account with RSI. The state ultimately submitted a proof of claim for $6,422,243.58.

In early 2006, PWE asked the bankruptcy trustee to initiate an adversary proceeding against the state to avoid the taxes the state had collected as preferential and fraudulent transfers. See In re Racing Servs., 540 F.3d at 896. When the trustee declined, PWE, through litigation, obtained "derivative standing" to bring this adversary proceeding against the state on behalf of all RSI's creditors. Id. at 902, 905.

In its complaint, PWE asked the bankruptcy court to (1) disallow the state's claim against the bankruptcy estate for unpaid taxes, (2) deny priority to the state's claim, (3) avoid and recover allegedly preferential and fraudulent transfers to the state, and (4) equitably subordinate the state's claim. On cross-motions for summary judgment, the bankruptcy court granted the state's motion with respect to PWE's challenge to the state's tax claim, but denied summary judgment as to the remaining claims. This appeal concerns only the first claim.

In rejecting PWE's claim, the bankruptcy court "conclude[d] that during the times relevant to this case, N.D. [Cent. Code] § 53-06.2-11 authorized taxation on account wagering." The bankruptcy court reasoned,

> When the legislature amended N.D. [Cent. Code] § 53-06.2-10.1 to authorize account wagering in 2001, it characterized account wagering as a form of simulcast parimut[u]el wagering. Although the 2002-2003 version of N.D. [Cent. Code] § 53-06.2-11 did not expressly reference account wagering activity, it did apply to simulcast wagering. By virtue of N.D. [Cent. Code] § 53-06.2-10.1, account wagering was simulcast wagering, and the tax for simulcast wagering was authorized under N.D. [Cent. Code] § 53-06.2-11.

The bankruptcy court further decided that "[e]ven if N.D. [Cent. Code] § 53-06.2-11 were ambiguous as to whether it applied to account wagering," ordinary rules of statutory construction indicated the state had authority to collect taxes for account wagering.

PWE appealed the grant of summary judgment. The district court reversed and remanded for further proceedings. Finding "North Dakota's gambling laws [] plain and unambiguous," the district court determined "[t]here was no legislative authority to collect taxes on account wagering during the time period in question and there is no legal basis to infer or imply authorization to do so." The state now appeals the district court's order that the money the state "collected from RSI in the form of taxes on account wagering must be returned to the bankruptcy estate."

## II.  DISCUSSION

### A.  Standard of Review

Sitting "as a second court of review in bankruptcy matters, [we] generally apply[] the same standards of review as the district court and review[] the bankruptcy court's factual findings for clear error and its conclusions of law de novo." In re M & S Grading, Inc., 526 F.3d 363, 367 (8th Cir. 2008). "The interpretation of a statute is a question of law for the trial court, subject to de novo review on appeal." In re Graven, 936 F.2d 378, 384-85 (8th Cir. 1991); accord Salve Regina Coll. v. Russell, 499 U.S. 225, 239 (1991). "Because th[is] case presents a matter of first impression in [North Dakota], we must predict, as best we can, how the [North Dakota] Supreme Court would decide it." JPMorgan Chase Bank, N.A. v. Johnson, 719 F.3d 1010, 1015 (8th Cir. 2013).

### B.  Plain Meaning

In 2001, the North Dakota legislature amended § 53-06.2-10.1 to authorize "account wagering." As amended, § 53-06.2-10.1 provided in relevant part,

> **53-06.2-10.1. Simulcast wagering.** In addition to racing under the certificate system, as authorized by this chapter, and conducted upon the premises of a racetrack, simulcast parimutuel wagering may be conducted in accordance with this chapter and interim standards that need not comply with chapter 28-32, or rules adopted by the commission under this chapter. . . . The certificate system also permits parimutuel

wagering to be conducted through account wagering. As used in this section, "account wagering" means a form of parimutuel wagering in which an individual deposits money in an account and uses the account balance to pay for parimutuel wagers. An account wager made on an account established in this state may only be made through the licensed simulcast service provider authorized by the commission to operate the simulcast parimutuel wagering system under the certificate system. An account wager may be made in person, by direct telephone communication, or through other electronic communication in accordance with rules adopted by the commission.

2001 N.D. Laws ch. 466, § 1. The state concedes that in amending § 53-06.2-10.1 to allow account wagering in 2001, the legislature did not, as it had with prior amendments, make any corresponding changes to § 53-06.2-11 or otherwise alter the statutory takeout formulas. The legislature did not specifically amend § 53-06.2-11 to authorize a tax on account wagering until 2007—several years after the state collected the taxes at issue in this case. See 2007 N.D. Laws ch. 448, § 7.

The contested issue in this appeal is whether North Dakota law *impliedly* authorized the state to collect taxes from RSI for account wagering during the period preceding RSI's bankruptcy, even though, as the district court observed, "there was no direct legislative authority to collect a tax on account wagering prior to the 2007 amendments." Based on the plain meaning of the relevant statutes and fundamental principles of North Dakota law, we agree with the district court and conclude North Dakota law did not expressly or impliedly authorize the state to collect taxes for account wagering during the time period in dispute here.

The state—though acknowledging the clear and unambiguous meaning of § 53-06.2-11 and the absence of affirmative legislative action to tax account wagering—urges the court to infer an implied tax on account wagering. Yet the state fails to provide any compelling legal basis for taking such an unprecedented step.

The North Dakota Constitution provides, "No tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied." N.D. Const. art. X, § 3. The North Dakota Supreme Court has long held, "The power to impose taxes should not be extended beyond the clear meaning of the statutes." Great N. Ry. Co. v. Flaten, 225 N.W.2d 75, 78 (N.D. 1974); accord Rice v. United States, 53 F. 910, 912 (8th Cir. 1893) ("'It is a general rule, in the interpretation of all statutes levying taxes or duties upon subjects or citizens, not to extend their provisions by implication beyond the clear import of the language used, or to enlarge their operation so as to embrace matters not specially pointed out, although standing upon a close analogy.'" (quoting United States v. Wigglesworth, 28 F. Cas. 595, 596-97 (Story, Circuit Justice, C.C.D. Mass. 1842) (No. 16,690))).

Our review of North Dakota tax law "is limited by the doctrine of separation of powers. Taxation of property is a legislative function, not a judicial function, and courts may not substitute their judgment for that of the" legislature. Dakota Nw. Assocs. Ltd. v. Burleigh Cnty. Bd. of Cnty. Comm'rs, 616 N.W.2d 349, 350-51 (N.D. 2000) (internal citations omitted). Under North Dakota law, our "primary objective is 'to ascertain the intent of the Legislature by looking at the language of the statute itself and giving it its plain, ordinary, and commonly understood meaning.'" City of Fargo v. White, 839 N.W.2d 829, 832 (N.D. 2013) (quoting McDowell v. Gillie, 626 N.W.2d 666, 671 (N.D. 2001)). We first must "look[] to the statutory language, and if the language is clear and unambiguous, the legislative intent is presumed clear from the face of the statute." Id.

"If, however, the statute is ambiguous or if adherence to the strict letter of the statute would lead to an absurd or ludicrous result, a court may resort to extrinsic aids, such as legislative history, to interpret the statute." State v. Fasteen, 740 N.W.2d 60, 63 (N.D. 2007). "When other means of ascertaining the legislature's intentions have failed," the North Dakota Supreme Court strictly construes

ambiguous tax statutes in favor of the taxpayer. See Amerada Hess Corp. v. State ex rel. Tax Comm'r, 704 N.W.2d 8, 17 (N.D. 2005); Great N. Ry. Co., 225 N.W.2d at 78 ("Where legislative intention is doubtful with respect to the meaning of the statutes granting taxing authority, the doubt must be resolved against the government and in favor of the taxpayer.").

As relevant to this appeal,[5] the bankruptcy court determined "application of the rules of statutory construction . . . lead[s] to the conclusion that [N.D. Cent. Code § 53-06.2-11] did apply to account wagering." As the bankruptcy court saw it, "[h]ad the legislature not intended for account wagering to be subject to taxation under N.D. [Cent. Code] § 53-06.2-11, the activity authorized by the legislature in N.D. [Cent. Code] § 53-06.2-10.1 would have been in contravention of the prohibition against games of chance without a charitable purpose as delineated in the North Dakota Constitution." See N.D. Const. art. XI, § 25 ("[T]he entire net proceeds of such games of chance are to be devoted to educational, charitable, patriotic, fraternal, religious, or other public-spirited uses."). The bankruptcy court thought such a result would be "absurd."

The state advances that argument on appeal, contending account wagering "requires a bet payoff formula to accomplish that [constitutional] goal" of a charitable purpose and "[t]he Takeout Statute [§ 53-06.2-11] is the only such available mechanism that would serve that purpose." The state does not contend taxes satisfy the constitutional requirement,[6] rather it argues taxes are "inseparably intertwined"

_____

[5]On appeal, the state concedes the bankruptcy court erroneously concluded "account wagering was simulcast wagering, and the tax for simulcast wagering was authorized under N.D. [Cent. Code] § 53-06.2-11."

[6]The district court noted "[t]axes are not enumerated" in N.D. Const. art. XI, § 25. PWE argues horse racing is not a game of chance and thus not subject to the restrictions in N.D. Const. art. XI, § 25 at all. We assume for the purposes of this appeal that N.D. Const. art. XI, § 25 applies to parimutuel wagering.

-9-

with the statutory directive to pay the balance of the wager pool to charitable organizations. According to the state, "to avoid the absurd result of authorizing a form of parimutuel wagering without a corresponding bet payoff formula that would satisfy the constitutional requirements, even despite requiring the payment of revenues to the State," this court—notwithstanding admittedly unambiguous statutory language to the contrary—should consider § 53-06.2-11 "to have been amended by implication to include account wagering within its scope of coverage."

The state asks too much. "The function of the courts is to interpret the law, not to legislate." CybrCollect, Inc. v. N.D. Dep't of Fin. Insts., 703 N.W.2d 285, 294 (N.D. 2005). We are "not free to 'amend' or 'clarify' the clear language of the statute," Estate of Christeson v. Gilstad, 829 N.W.2d 453, 457 (N.D. 2013), nor can we disregard the letter of a "clear and unambiguous" statute "'under the pretext of pursuing its spirit.'" Gadeco, LLC v. Indus. Comm'n of State, 830 N.W.2d 535, 541 (N.D. 2013) (quoting N.D. Cent. Code § 1-02-05); accord Little v. Tracy, 497 N.W.2d 700, 705 (N.D. 1993) ("[T]he law is what the Legislature says, not what is unsaid.").

The state has not provided, and we have not found, any authority recognizing a judicial power to infer an implied tax under North Dakota law. To the contrary, the North Dakota Supreme Court has routinely rejected similar "invitation[s] to rewrite the statute to express [a party's] interpretation of the legislature's alleged 'true' intent." Gilstad, 829 N.W.2d at 457; see also, e.g., Doyle ex rel. Doyle v. Sprynczynatyk, 621 N.W.2d 353, 357 (N.D. 2001) ("We have said many times if changes are to be made in the statute, we leave that matter to the legislature."). Not only must this court "presume the legislature meant what it said and said all it intended to say," but also "that the legislature made no mistake in expressing its purpose and intent." Gilstad, 829 N.W.2d at 457. "'If the rule is wrong, the Legislature has ample power to change it. It is the duty of the courts to enforce the law as it exists.'" Fetzer v. Minot Park Dist., 138 N.W.2d 601, 604 (N.D. 1965) (quoting Anderson v. Bd. of Ed. of Fargo, 190 N.W. 807, 811 (N.D. 1922)

-10-

(Christianson, J., concurring)). "'Consequently, we will not correct an alleged legislative "oversight" by rewriting unambiguous statutes to cover the situation at hand.'" Gilstad, 829 N.W.2d at 457 (quoting Pub. Serv. Comm'n v. Wimbledon Grain Co., 663 N.W.2d 186, 196 (N.D. 2003)).

To be clear, the state does not ask us to adopt an alternative *interpretation* of the relevant statutory language. It asks us to infer an alternative *legislative intent* despite the clear and unambiguous statutory language, and thereby amend § 53-06.2-11 to carry out that unstated intent. "It is for the legislature, not the courts, to amend a statute if the plain language of the statute does not accurately reflect the legislature's intent." Olson v. Workforce Safety & Ins., 747 N.W.2d 71, 78 (N.D. 2008). The legislature ostensibly did that here in 2007, notably imposing lower tax rates on account wagering under § 53-06.2-11. See 2007 N.D. Laws ch. 448, § 7. Taxes the state collected from RSI on account wagering before that time were unauthorized under North Dakota law and must be repaid to the bankruptcy estate.

### C.    Legislative History

The state's appeal to what it broadly refers to as "legislative history" does not convince us otherwise. See Little, 497 N.W.2d at 705 ("Usually, when the plain meaning of a statute is apparent, it is unwise and unnecessary to delve further."). In the state's view, "it is apparent from the legislative history that the Legislature approved account wagering legislation with the understanding that the new form of wagering would generate revenue for the State 'under the existing charitable system' – i.e., including the Takeout Statute."

To the extent, if at all, extrinsic aids are proper here, where the state admits the statute is unambiguous, see Schaefer v. N.D. Workers Comp. Bureau, 462 N.W.2d 179, 182 (N.D. 1990) ("[W]hen a statute is clear and unambiguous it is improper for courts to attempt to go behind the express terms of the provision so as to legislate that which the words of the statute do not themselves provide."), the state's evidence of

-11-

legislative history "provides little insight," <u>Metric Constr., Inc. v. Great Plains Props.</u>, 344 N.W.2d 679, 683 (N.D. 1984), much less an intimation so compelling it would justify a federal court taking the unprecedented step of inferring an implied tax under North Dakota law.

In support of its proposed intent, the state primarily relies on the following: statements RSI's owner made while lobbying to get the account wagering bill passed; "legislative points" RSI provided to "several state senators"; a senate notice of intent; and a statement about revenue from one of the bill's sponsors. This evidence is far from convincing. "Random statements by legislative committee members, while possibly useful if they are consistent with the statutory language and other legislative history, are of little value in fixing legislative intent." <u>Little</u>, 497 N.W.2d at 705. And we are especially wary of divining legislative intent from statements by RSI's owner, who lobbied for account wagering legislation but was not a member of the legislature and did not vote on the bill. <u>Cf.</u> <u>Metric Constr.</u>, 344 N.W.2d at 683 (questioning the value of extrinsic evidence that "mostly consist[ed] of sponsor testimony or citizen testimony preserved in the form of sparse committee notes").

Though some members of the legislature may have understood account wagering would be taxed similarly to existing forms of parimutuel wagering, the state fails to establish that understanding was widely held or that it necessarily follows from the scant legislative history. The state's belief also does not make the statute as written ambiguous or require this court to strain to infer a legislative intent to tax that is entirely absent from the statutory language. <u>See</u> <u>Olson</u>, 747 N.W.2d at 78. Obliged as we are to apply what is undisputed plain language, <u>see</u> <u>id.</u>, our diversion into legislative history reveals no reason to doubt the plain meaning of the statute's text.

### D. Constitutional Avoidance

Finally, the state points out the North Dakota Supreme Court generally "construe[s] statutes, if possible, in a manner to avoid constitutional infirmities."

-12-

Ellis v. N.D. State Univ., 764 N.W.2d 192, 202 (N.D. 2009); accord Ash v. Traynor, 579 N.W.2d 180, 182 (N.D. 1998) ("If a statute may be construed in two ways, one that renders it of doubtful constitutionality and one that does not, we adopt the construction that avoids constitutional conflict."). This canon cuts both ways.

First, we are not convinced, under a natural reading of § 53-06.2-10.1, that the absence of a tax levy or "corresponding bet payoff formula" necessarily makes the legislative authorization of account wagering unconstitutional under N.D. Const. art. XI, § 25. See Paluck v. Bd. of Cnty. Comm'rs, Stark Cnty., 307 N.W.2d 852, 857 (N.D. 1981) ("[A]n enactment of the Legislature is presumed to be constitutional; the courts will construe statutes so as to harmonize their provisions with the Constitution if it is possible to do so."). As long as "the entire net proceeds" of account wagering serve "educational, charitable, patriotic, fraternal, religious, or other public-spirited uses," account wagering does not violate N.D. Const. art. X, § 25, regardless of the absence of a specific statutory payoff formula. Without the assessment of taxes, more money is available for the beneficent purposes. If the state were to determine some part of the net proceeds of statutorily authorized account wagering were not serving such purposes, the state could simply stop those unconstitutional activities. We fail to see any absurdity here.

Second, assuming the requisite statutory ambiguity, avoiding constitutional infirmities is not so easy where, as here, two constitutional provisions are pitted against each other. The state urges the court to infer an implied tax on account wagering because "unless parimutuel account wagering was subject to taxation during the period of time relevant to this case, account wagering would have been contrary to the constitutional prohibition against games of chance under N.D. Const. art XI, § 25." In contrast, PWE suggests a judicially implied tax, which also requires an implied tax rate and collection method, violates the requirements of N.D. Const. art. X, § 3. By PWE's measure, we cannot "imply authority to tax and an amount of tax

-13-

to avoid [the state's] perceived unconstitutionality" because "if the Court were to imply a tax, this implied tax would, itself, be unconstitutional."

Confronted with the requirements of N.D. Const. art. X, § 3, the state proposes it is "trying to address the constitutional provision *after* [it] impl[ies] the account wagering into the taxation." (Emphasis added). That is, once the tax is "inferred or implied," the requirements of N.D. Const. art. X, § 3 are met. The state's analysis puts the cart before the horse. And at any rate, "[t]he canon of constitutional avoidance does not supplant traditional modes of statutory interpretation," Boumediene v. Bush, 553 U.S. 723, 787 (2008), and "is not a license for the judiciary to rewrite language enacted by the legislature." Salinas v. United States, 522 U.S. 52, 59-60 (1997) (quoting United States v. Albertini, 472 U.S. 675, 680 (1985)). Here, the unambiguous statutory language did not authorize the taxes the state collected on account wagering.

## III.    CONCLUSION

We affirm the judgment of the district court and remand to the bankruptcy court for the calculation of the amount of unauthorized taxes the state must return to the bankruptcy estate.

_____